SANFORD H. HARTMAN AND HENRIETTA HARTMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

U.S. ASIATIC CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1873–62, 1874–62, 1249–63, 2470–63. Filed October 26, 1964.

*Robert B. Hodes* and *John Dwight Evans, Jr.*, for the petitioners. *Joseph Wilkes* and *Eugene Parker*, for the respondent.

PIERCE, *Judge:* The Commissioner determined deficiencies in the income taxes of the petitioners as follows:

*Sanford H. and Henrietta Hartman*

| Docket Nos. | Calendar year | Deficiency |
|---|---|---|
| 1873–62 | 1955 | $29,747.26 |
| 2470–63 | 1956 | 37,975.18 |
| | 1957 | 27,753.28 |
| | 1958 | 26,915.96 |

*U.S. Asiatic Co., Inc.*

| Docket Nos. | Calendar year | Deficiency |
|---|---|---|
| 1874-62 | 1955 | $36,380.33 |
| 1249-63 | 1956 | 45,734 49 |
| | 1957 | 35,149.37 |
| | 1958 | 33,065.87 |

The cases were consolidated for trial.

Petitioner Sanford Hartman, the sole stockholder of the corporate petitioner, U.S. Asiatic Co., organized in form at least a partnership (Shafford Co.), with himself and two trusts for his minor children as partners, which thereafter principally engaged in merchandising, marketing, and distributing ceramic ware imported into the United States by Asiatic Co. The issues presented herein for decision are:

(1) Whether Shafford Co. was actually a separate business organization, or whether it was merely a division of Asiatic Co., so that the income arising from its operations should be included in the income of and taxed to Asiatic Co.

(2) Whether, if Shafford Co. *was not* a separate organization, the portions of its income credited to the above-mentioned trusts for the Hartman children as their distributive shares of partnership income, should be taxed to petitioner Sanford Hartman as dividends from his wholly owned corporation.

(3) Whether, if Shafford Co. *was* a separate business organization, it was a valid partnership; or whether, in said circumstance, it was in substance merely petitioner Sanford Hartman's sole proprietorship, so that he would be taxable with all of Shafford Co.'s income.

(4) Whether assessment and collection of any deficiencies that may be held to be due from either the corporate petitioner or the individual petitioners are barred by the statute of limitations.

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulations of fact, together with the exhibits identified therein, are incorporated herein by reference.

The individual petitioners, Sanford H. and Henrietta Hartman, are residents of New York City, N.Y. They filed a joint income tax return for each of the calendar years 1955 through 1958, with the district director of internal revenue for the Lower Manhattan District in New York City. These individual petitioners will hereinafter be referred to by their given names, Sanford and Henrietta, respectively.

The corporate petitioner, U.S. Asiatic Co., Inc. (hereinafter called Asiatic), is a corporation organized in 1948 under the laws of the

Commonwealth of Pennsylvania. Instruments purporting to be Federal corporation income tax returns (Form 1120) were filed on behalf of the corporate petitioner on the basis of an accrual method of accounting for each of the calendar years 1955 through 1958, with the district director, Lower Manhattan District, New York City.

From the time of its organization in 1948 and until 1952, Asiatic engaged in a business of importing merchandise, chiefly ceramic ware, from Japan and selling the same throughout the United States, chiefly to chain stores and in a lesser amount to jobber-wholesalers. Its president-treasurer and sole stockholder was Sanford Hartman. Sanford paid in initially $1,000 for the capital stock of Asiatic; but its main source of capital funds in the first 4 years of its operation was money which either the corporation, or Sanford acting in its behalf, borrowed from Nathaniel P. Kann, Sanford's brother-in-law. By 1952, the outstanding indebtedness to Kann was $85,000. In that year, the corporation obtained a loan of $85,000 from a Pittsburgh bank, which was used to pay off the indebtedness to Kann. The corporation was able to obtain such loan only because of Kann's individual endorsement of the corporation's note and because Kann was a stockholder and large depositor in the Pittsburgh bank. Asiatic was never in default on the note; and it was entirely repaid by early 1955, the beginning of the taxable period here involved.

Asiatic's method of operations through 1952 was substantially as follows. Sanford would go to Japan twice each year. Upon arrival in Japan, he would make his headquarters at the office of a Japanese concern called U.S. Asiatic Co., Ltd. (hereinafter called Asiatic-Japan, and to be distinguished from petitioner corporation U.S. Asiatic Co., Inc.). Neither Sanford nor Asiatic had any financial interest or stock ownership in Asiatic-Japan; nor was Sanford an employee or officer of Asiatic-Japan. Sanford would describe to artists employed by Asiatic-Japan ideas which he had for designs in ceramic ware; and based upon what Sanford told them the artists would make sketches and designs. Sanford would then place orders for the merchandise thus designed, for Asiatic. Other employees of Asiatic-Japan would thereupon, acting as agents for Asiatic, arrange with Japanese factories to manufacture the products ordered by Asiatic, and also see to having the same shipped to the United States consigned to Asiatic.

When such merchandise arrived in the United States, Asiatic would pay the customs import duties on the portion thereof that had already been sold to its American customers; and the balance was in large part stored in bonded warehouses. With regard to the merchandise stored in bonded warehouses, Asiatic would pay the import duties thereon when the goods had been sold, and would remove the same from the warehouses for shipment to its customers.

The results of Asiatic's operations for its first 4 years, as reported on its Federal income tax returns, were approximately as follows:

| Year | Income (or loss) |
|------|------------------|
| 1948 | ($9, 000) |
| 1949 | (6, 400) |
| 1950 | [1] 2, 600 |
| 1951 | [1] 26, 756 |

[1] Before taking into account net operating loss carryovers.

The profits realized in 1950 and 1951 were largely attributable to increased sales that resulted from a scarcity of Japanese goods, occasioned by the Korean War.

The above-mentioned Kann, who was the source of the bulk of Asiatic's working capital, was dissatisfied with the results of Asiatic's operations, which he attributed to Sanford's preoccupation with the designing and importing phases of the business that necessitated the latter's absence from the country for extended periods; and Kann also attributed such results to Sanford's lack of aptitude for, and neglect of, the selling phase of the business.

Prior to 1952, Kann began insisting that a separate sales organization be established to sell the merchandise imported into the United States by Asiatic. Kann suggested that the sales organization take the form of a partnership made up of Sanford and his two minor children: Dana Lee Hartman, a daughter born in 1944; and James D. Hartman, a son born in 1949. Despite some reluctance, Sanford ultimately agreed to Kann's proposals.

Accordingly on February 1, 1952, a partnership [1] of Sanford, Dana Lee, and James Hartman was formed, to take over the merchandising, marketing, and distributing of the merchandise imported into the United States by Asiatic. The name of the partnership was the Shafford Co. Its initial capital was $900, supplied in equal parts by the three partners, with the capital of Dana Lee and James having its origin apparently in a gift to each child of $300 from their father. Asiatic also made a loan of $2,000 to Shafford Co. at the time it commenced operations.

At about this same time, appropriate instruments certifying to the conduct of Shafford Co.'s business as a partnership were filed with the county clerk of New York County. Also in early 1952 New York State officials determined that Shafford Co. was an employer, liable for contributions under the New York State unemployment insurance law; and other State officials notified the partnership as to the rate of its contributions for unemployment insurance.

[1] It is to be understood that the use in these Findings of Fact of such terms of designation as "partnership" and "partners," is for the Court's convenience; and such use in the findings does not necessarily infer that the Shafford Co. is either a separate business organization, or that it is a valid partnership for Federal tax purposes.

On June 28, 1954, about 29 months after the organization of the Shafford Co. partnership (but stated to be effective as of February 1, 1952), Sanford entered into a voluntary trust agreement, whereunder he established by gift two trusts, one for Dana Lee and one for James, respectively. The initial corpus of each trust was $300;[2] and the trustees of each trust were: Henrietta Hartman (mother of the children); Nathaniel Kann (the children's uncle by marriage, and Sanford's brother-in-law); and George P. Slesinger, an attorney whom Sanford had known for almost 20 years but who was not related to the children. Kann and Slesinger lived in Pittsburgh, Pa.; and Henrietta Hartman lived with Sanford and the children at their home near New York City.

The trusts were made irrevocable. The trustees were given broad powers to determine what should be added to income and what should be added to the principal of such trusts; and they were also given broad powers of investment, including the power to engage in a partnership business. In the event of the death or resignation of a trustee, either the remaining trustees or the court having jurisdiction over the trusts were given the right to name the successor trustee. The settlor was forever disqualified from becoming a trustee. The trusts were to last until the beneficiaries reached the age of 40 years, with appropriate provision being made for disposition of principal and any accumulated income in the event of the death of a beneficiary prior to reaching his 40th year.

On the same date of June 28, 1954 (but again effective as of February 1, 1952), an agreement was entered into between Sanford and the trustees of the just-mentioned trusts for his children, the purpose and effect of which was to substitute *nunc pro tunc* such trusts in the place of the children themselves, as partners with Sanford in Shafford Co. This partnership agreement provided, among other things, as follows:

5. The net profits or net losses of the partnership shall be distributable or chargeable equally to the parties hereto and distribution of profits to the partners shall be made at such times as are mutually agreeable to all the partners.

6. The party of the first part [Sanford] shall draw as a salary the sum of $25,000.00 per year payable in periodic installments. Said salary shall be deducted from the profits before computing the profit shares of the parties, but the payment of same shall be an obligation of the partnership only to the extent that there are partnership assets available therefor and shall not be an obligation of the parties individually.

7. The party of the first part agrees to render such effort and time to the partnership business as is necessary to the best interests of the partnerhip.

\*       \*       \*       \*       \*       \*       \*

[2] The $300 designated as the corpus of each trust is apparently the same $300 which was advanced by each of the child-partners to the Shafford Co. at the time of its formation in Feb. 1952.

12. The parties of the second part [trustees of Dana Lee's trust] and the parties of the third part [trustees of James' trust] shall designate one of the individual Trustees as authorized to act in their behalf in carrying out the terms of said Partnership Agreement. The said parties shall advise the party of the first part by registered mail of the name of the Trustee so selected, provided, however, that said Trustees shall have the right by a majority vote to change such appointment by giving the party of the first part prior written registered mail notice of the change. All notices provided for under this Agreement shall be sufficient if sent by registered mail to the last known address of the party to whom such notice is being given.

About 1 month later, on July 28, 1954, the trustees notified the Shafford Co. that, pursuant to the just-quoted paragraph 12 of the partnership agreement, they had designated Henrietta Hartman to act in the trustees' behalf in carrying out the terms of said partnership agreement.

Beginning with the formation of the partnership on February 1, 1952, and continuing thereafter throughout the last taxable year here involved (1958), Asiatic, in form at least, carried on only a business of designing, procuring the manufacture of, and importing into the United States ceramic ware from Japan. Most, if not all, of the merchandise so imported was sold to Shafford Co., at a mark-on of 10 percent over "landed cost." [3] In addition to selling merchandise to that partnership, Asiatic also took orders for Japanese ceramic ware from selling concerns in Canada, Australia, New Zealand, South Africa, Belgium, and the Netherlands, for which it placed orders in Japan and which it caused to be shipped directly to the foreign purchasing concerns. The selling concerns paid Asiatic commissions based on the purchase price for its service in obtaining merchandise from Japan for them. Asiatic had only one paid employee during the 7-year period—its president and treasurer, Sanford Hartman.

The Shafford Co. during this 7-year period carried on a business, in partnership form, of merchandising, marketing, and selling ceramic ware throughout the United States. The merchandise handled by Shafford Co. was purchased, in overwhelming part, from Asiatic. However, beginning in 1956 and continuing throughout 1957 and 1958, it also purchased merchandise for sale in the United States from certain Italian pottery-manufacturing firms. During its first 3 years of operation, it did not carry inventories, but rather confined its purchases to such quantities of merchandise as it had firm sales orders for. Beginning in the fourth year (fiscal year ending January 31, 1956), it did start to carry inventories of merchandise. Throughout the taxable years involved (1955–58) a regular system of invoicing was followed in the dealings between Asiatic and Shafford Co.; and Shafford paid promptly for all goods which it purchased from Asiatic.

---

[3] "Landed cost" embraced all the items of cost incurred, from the point of paying the Japanese manufacturers for the goods to paying the customs import duties on the goods after their arrival in the United States.

To sell its goods, Shafford Co. engaged a group of commission salesmen who traveled throughout the United States, displaying samples and taking orders for merchandise. In addition to this sales force (the exact number of which is not shown by the record), Shafford employed clerical and other employees which varied in number from 6 persons in the first quarter of 1952, to 14 in the last quarter of 1958. The sales force which Shafford employed was not in existence in the years when Asiatic was merchandising and marketing its imports. Rather it was recruited, trained, and organized after the formation of the Shafford Co. partnership.

The customers which Asiatic had served were taken over by Shafford Co. To the number of such customers, the partnership added numerous others. By causing a change in the size of the containers in which its merchandise was received from the foreign manufacturers from crates to smaller cartons (a carton containing only one-fifth the amount of merchandise that a crate contained), the partnership was able to sell to smaller retail stores who were unwilling to buy a crate of ceramic ware at one time.

The Shafford Co. has always maintained its own separate bank account and its own separate set of books of account. It has always been separately listed in the New York City telephone directory; and it has always had its own separate telephone number. Its principal office has always been located in the same premises as were occupied by Asiatic. In addition to its principal office, the Shafford Co. also maintains a separate showroom on Fifth Avenue in New York for the display of the merchandise which it sells.

With regard to the activities of the partners of Shafford Co., the Hartman children (the beneficiaries of the trusts) took no part in the conduct of the business. Each of the trustees did take some part— the most active of whom was Nathaniel Kann. Kann took the lead in recruiting, organizing, and training the partnership's sales force, utilizing the experience which he had gained in organizing insurance sales forces in Pittsburgh in earlier years when he had been in the insurance business. Throughout the taxable years, he made frequent trips to New York to confer with Sanford and other employees of Shafford Co., especially its salesmen. While in New York, he would himself analyze the partnership's accounts receivable, and advise as to methods of dealing with delinquent accounts. Page proof of catalogs used by Shafford Co. was submitted to him for his recommendations as to deletions from and additions to the items featured therein. Kann also conferred regularly with Sanford in making projections of anticipated sales, with a view to making certain that merchandise in sufficient quantity would be ordered in sufficient time to be available for delivery when sold.

One of the principal of Kann's activities was that with respect to Shafford Co.'s participation in the annual glass and china show held in Pittsburgh each January, to which buyers representing stores throughout the United States came. Kann was instrumental in arranging and designing the layout of Shafford Co.'s display at this show. While the show was in progress, Kann not only talked to visiting buyers and actually made sales, but he took the occasion as an opportunity to confer with Shafford Co.'s salesmen who were brought to Pittsburgh for the show. Kann also made arrangements for hotel accommodations for those visiting buyers who were good customers or valuable prospects of Shafford Co. In addition, Kann was host each year at a party in his penthouse apartment to which he invited these buyers and prospects.

Henrietta's participation in partnership affairs was mainly confined to discussing new designs for ceramic ware with her husband, Sanford, who (as above found as a fact) was also one of the partners in the Shafford Co. Inasmuch as most of the ultimate consumers who purchased ceramic ware were women, Sanford regarded Henrietta's woman's viewpoint as valuable. Henrietta also helped out at the Shafford Co.'s display at the glass and china show, and did some selling there.

Slesinger's activities were largely confined to conferring with Kann concerning partnership matters, before and after the latter's trips to New York. Slesinger also discussed partnership business affairs with Kann, Sanford, and Henrietta during the times of the annual glass and china show in Pittsburgh.

As far as Sanford's activities as a partner in Shafford Co. were concerned, he was the managing partner; and under the partnership agreement he received an annual salary of $25,000 per year. He had principal responsibility for purchasing merchandise for the partnership and overseeing its day-to-day operations when he was not out of the country.

As hereinabove found as a fact, Shafford Co.'s initial operating funds were supplied by $900 of capital contributed by the partners, and a $2,000 cash loan from Asiatic. At the outset of the partnership, Asiatic also granted liberal and favorable credit terms to the partnership on its purchases of merchandise, and thereby in effect supplemented the capital available to said partnership. As the years passed, the partners supplemented the partnership capital by leaving in, and not withdrawing, large portions of their shares of the firm's earnings. The capital of Shafford Co. (as shown on the balance sheets attached to the partnership information returns which it filed) at the end of its fiscal years ended January 31, 1953 through 1959, was as follows:

| FYE Jan. 31— | Partnership capital | Share of capital held by— | | |
|---|---|---|---|---|
| | | Sanford | Trust for Dana Lee | Trust for James |
| 1953 | $58,766.86 | $26,181.20 | $16,292.83 | $16,292.83 |
| 1954 | 109,664.42 | 31,588.36 | 39,038.03 | 39,038.03 |
| 1955 | 155,612.13 | 43,145.09 | 56,233.52 | 56,233.52 |
| 1956 | 209,703.65 | 58,280.97 | 75,711.34 | 75,711.34 |
| 1957 | 231,174.55 | 48,289.79 | 91,442.38 | 91,442.38 |
| 1958 | 251,234.06 | 53,414.10 | 98,909.98 | 98,909.98 |
| 1959 | 268,845.88 | 58,049.57 | 105,398.16 | 105,398.15 |

The capital of Shafford Co. was actively employed in its merchandising business, to enable it to extend credit to its customers and to carry the resultant accounts receivable until they were collected (in some instances for as much as 3 months for those of its customers who conducted a seasonal business) ; to enable it to follow its practice of paying its salesmen commissions on their sales orders by the 15th of the month following invoicing to the customers, which commissions were often paid prior to receipt of payment from customers with respect to such orders; and (beginning in its fiscal year ended January 31, 1956) to enable it to maintain an inventory of ceramic ware.

The following table shows: (1) Shafford Co.'s trade accounts receivable; (2) the amount of commissions paid to its salesmen; (3) the amount of its other operating expenses (exclusive of amounts paid to Sanford as salary) ; and (4) the amount of its merchandise inventory— in each instance for, or at the close of, the partnership's fiscal years ended January 31, 1953 through 1959:

| FYE Jan. 31— | Trade account receivable | Salesmen's commissions | Operating expenses | Merchandise inventory |
|---|---|---|---|---|
| 1953 | $50,829.36 | $34,834.00 | $54,522.29 | (1) |
| 1954 | 105,138.29 | 32,824.79 | 68,450.63 | (1) |
| 1955 | 152,571.78 | 29,522.73 | 89,917.87 | (1) |
| 1956 | 114,091.58 | 35,427.75 | 50,015.04 | $118,627.33 |
| 1957 | 121,612.81 | 57,421.46 | 58,194.00 | 78,114.85 |
| 1958 | 113,066.93 | 59,025.66 | 156,637.62 | 128,573.68 |
| 1959 | 117,521.87 | 59,575.33 | 165,349.33 | 50,400.70 |

[1] None.

Fiduciary returns (Form 1041) were filed with the district director, Lower Manhattan District, for each of the trusts for the children of Sanford, for each of the years 1955 through 1958. The income shown on each trust's return for each year was the trust's distributive share of the profits of the Shafford Co. for the partnership's fiscal year which ended in the trust's calendar year.

For the year 1953, and through the year 1958, both the trust estate of Dana Lee Hartman and the trust estate of James D. Hartman made withdrawals from the trusts' capital account in the Shafford Co. in sufficient amounts to pay the trusts' Federal and State income taxes.

Beginning in the year 1957, both trusts made investments outside the Shafford Co. In the year 1957, $213.25 was withdrawn by each trust to pay for life insurance on the lives of Dana Lee Hartman and James D. Hartman, respectively. In January 1958, the trustees of the two trusts authorized investments by the trusts in mutual funds. On June 25, 1958, both trusts, by Henrietta Hartman as trustee, entered into an investment plan with the Boston Fund Inc., and on August 8, 1958, the trusts, by Henrietta Hartman as trustee, entered into an investment plan with the Massachusetts Investors Trust. During the year 1958, each trust withdrew from the capital of the Shafford Co. $7,595.32, and each trust invested $500 in State of Israel bonds, $850 in the Boston Fund Inc., and $6,245.32 in the Massachusetts Investors Trust.

## Facts re Statute of Limitations

At the time when Asiatic's Federal income tax return for each of the years 1955 through 1958 was due to be filed, Sanford Hartman, its president and treasurer, was out of the country. Asiatic's only other duly elected officer was Henrietta Hartman, its secretary. Prior to leaving the country at those times when the returns for 1955 through 1957 were returned, Sanford authorized and instructed an individual named Cecile B. Bard to file Federal income tax returns for Asiatic. Federal corporation income tax returns on Form 1120 were timely filed on behalf of Asiatic and signed by Cecile B. Bard, with the notation "Atty." following her signature on the returns. Similarly, a return was timely filed for Asiatic for the year 1958 and signed by Joseph A. Weill as "Atty."

Cecile Bard was not a duly elected officer, director, or shareholder of Asiatic. She had been one of the first employees hired by Sanford in 1948 when Asiatic was organized. When Shafford Co. was organized, she became an employee of the partnership; and the documentary evidence of record herein fails to show that she had any formal employee connection with Asiatic thereafter. She did, however, continue to serve as Sanford's private secretary; and she had the custody of, was familiar with, and made the entries in Asiatic's books of account. She also had authority to sign checks and handle various transactions for Asiatic at the bank where Asiatic maintained its account.

Joseph A. Weill, who signed the 1958 return, was an attorney at law and a certified public accountant, employed by the independent accounting firm which audited Asiatic's books of account and prepared its Federal income tax returns. Weill was not an officer, director, shareholder, or employee of Asiatic. The record contains no explicit evidence of any authority given to Weill by Sanford or any other director, officer, or shareholder to sign the corporation's 1958 return.

The following table shows the gross income stated in the Federal income tax returns of Asiatic and of the individual petitioners, Sanford and Henrietta Hartman, for each of the years 1955 through 1958:

| Year | Asiatic | Sanford and Henrietta Hartman |
|---|---|---|
| 1955 | $582,709.49 | $53,850.16 |
| 1956 | 657,456.32 | 59,821.71 |
| 1957 | 683,417.88 | 53,993.66 |
| 1958 | 518,261.62 | 55,524.28 |

Partnership information returns (Form 1065) were filed by Shafford Co. with the district director, Lower Manhattan District, New York City, for each of its fiscal years ended January 31, 1955 through 1958. The following table shows the gross income reported on each of said returns:

| FYE Jan. 31— | Gross income |
|---|---|
| 1955 | $720,640.52 |
| 1956 | 743,257.41 |
| 1957 | 929,619.38 |
| 1958 | 953,739.64 |

The notice of deficiency sent to the petitioners in each of the dockets in the instant case was mailed more than 3 years but less than 6 years after the due date for filing the income tax return to which each such notice relates.

No agreement or waiver extending the statutory period for assessing Federal income taxes for the calendar years 1955 through 1958 which are here involved, was executed either by the corporate petitioner, U.S. Asiatic Co., Inc., or by the individual petitioners, Sanford and Henrietta Hartman.

### Facts re Respondent's Determinations

With respect to Asiatic, the respondent determined that the Shafford Co. was not a valid partnership for Federal income tax purposes, and that the partnership's reported net income for each of its fiscal years ending in 1955, 1956, 1957, and 1958, was includable in the income of Asiatic.

With respect to the individual petitioners, Sanford and Henrietta Hartman, the respondent's determination for the year 1955 was as follows:

(b) It has been determined that the partnership, The Shafford Company, is not a valid partnership for income tax purposes and the net income of the partnership for the taxable period ending January 31, 1955 is held to be additional net income of the corporation, the U.S. Asiatic Co., Inc. The amounts reported on the Trust Estates for Dana L. Hartman $24,171.17 and James D. Hartman $24,171.18, for the taxable period ending December 31, 1955, out of the partner-

ship, The Shafford Company, are determined to be dividend income to Sanford H. Hartman from his controlled corporation, the U.S. Asiatic Co., Inc. and gifts from Sanford H. Hartman to the said Trust Estates.

Respondent's determinations for 1956, 1957, and 1958 were to the same effect, differing only in the dollar amounts determined to constitute dividend income to Sanford Hartman.

### ULTIMATE FINDINGS OF FACT

The Shafford Co., during all periods involved in the instant case, was a business organization separate and distinct from U.S. Asiatic Co., Inc.

The Shafford Co., during all periods involved in the instant case, was a valid partnership for Federal income tax purposes; and it carried on a business in which capital was a material income-producing factor. The trusts for Dana Lee and James D. Hartman, together with Sanford, were the members of said valid partnership.

### OPINION

1. The first issue presented for decision in these consolidated cases has to do with the income tax liabilities of the corporate petitioner, U.S. Asiatic Co., Inc. Specifically, the issue is whether respondent was correct in including in the income of this petitioner, the entire net income of Shafford Co., a partnership in which the corporate petitioner's president-treasurer-sole-stockholder was the managing partner. The respondent's position on this issue is that Shafford Co. was not a separate and distinct business organization, but rather that it was merely a division of the corporate petitioner through which the merchandise imported by said petitioner was sold.

It is well, we think, at the outset to point out that respondent has neither determined, pleaded, nor argued that section 482 [4] furnishes warrant for his action. Accordingly, we have no occasion to, and we do not, pass upon the effect, if any, that section 482 would have, if applied to the facts of the instant case.

The issue presented is essentially a factual one. After considering and weighing all the evidence relevant to this issue, we have concluded, and made a finding of ultimate fact, that the Shafford Co. was a separate and distinct business organization. That ultimate finding of fact is dispositive. Of course, whether Shafford Co. was a valid *part-*

[4] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

*nership* (as the individual petitioners contend) is another question, and we shall consider it hereinbelow.

We cannot, upon this record, regard the Shafford Co. as a fiction or a sham; and it seems to us we would have to do just that if we were to follow the respondent's urging that we disregard it as a separate business organization. It had employees, both those working in its principal office and a nationwide organization of salesmen. It carried on an extensive business of merchandising, distributing, and selling ceramic ware throughout the United States. It conducted campaigns to advertise its wares, at least to the extent of participating in the annual glass and china show, setting up and publishing a catalog, and maintaining a New York City showroom for the display of the merchandise it handled.

We think too that the division of the designing, importing, merchandising, and selling business formerly conducted by Asiatic into two separate businesses (one to design and import ceramic ware, the other to merchandise and sell it) was a natural and proper division. Also we think the division was a real one, in that each of the two businesses confined its activities to those proper to the purpose for which it was formed. Separate books of account were maintained for the two organizations. Each had its own bank account. There was no intermingling and commingling of funds and other assets between the two.

There is not much doubt in our mind that tax-savings considerations had something to do with the organization of the Shafford Co. partnership. But certainly it was not the only reason; and on this record we cannot even say it was the dominant one. Sanford Hartman, for all his talents as a designer and an importer, was not greatly interested in, or adept at, selling the goods which Asiatic imported. It seems the part of commonsense to us to have separated the merchandising and selling functions from the others, and to have put them under the aegis of a more sales-minded person. This, we think, was what was done here, by putting Shafford Co. more in the charge of Kann. Perhaps this could have been accomplished by simply having Kann head a selling division within the corporation. Certainly, such an arrangement would have yielded greater Federal income tax revenues to the Government. But it needs always to be borne in mind that it is a "well-established principle that a taxpayer may adopt any form of doing business that he chooses and is not required to conduct his business affairs in the form most advantageous to the revenue." *Palm Beach Aero Corporation*, 17 T.C. 1169, 1176.

Cases are numerous upholding the right of taxpayers to fragmentize businesses conducted as an integrated unit into separate organizations each of which thereafter carried on a portion of the erstwhile larger single business. We cite here only a few of the better known of such

authorities: *Grenada Industries, Inc.*, 17 T.C. 231, affd. 202 F. 2d 873 (C.A. 5); *Palm Beach Aero Corporation, supra; Chelsea Products, Inc.*, 16 T.C. 840, affd. 197 F. 2d 620 (C.A. 3); *Buffalo Meter Co.*, 10 T.C. 83; *Miles Conley Co.*, 10 T.C. 754, affd. 173 F. 2d 958 (C.A. 4); and *Seminole Flavor Co.*, 4 T.C. 1215. See also, in this connection, *Moke Epstein, Inc.*, 29 T.C. 1005, acq. 1958–2 C.B. 6.

In the light of all the foregoing, we hold, in accordance with our ultimate finding of fact, that the Shafford Co. was a business organization separate and distinct from U.S. Asiatic Co., Inc. It follows that none of the income reported by Shafford Co. in its partnership returns is includable in said corporate petitioner's income. The respondent's determination to the contrary is reversed, and this issue is decided for the corporate petitioner.

2. The second issue is whether if Shafford Co. *was not* a separate organization, the portions of its reported partnership income that were credited to the trusts for Sanford Hartman's children, as the trusts' distributive shares, should be taxed to Sanford as dividends from Asiatic. Having decided under the first issue that Shafford Co. *was* a separate organization and that its income is not includable in the income of Asiatic, it follows that the amounts credited to the children's trusts from Shafford Co. partnership could not be and are not dividends to Sanford Hartman from Asiatic. We so hold.

3. Our third issue is whether the Shafford Co. was a valid partnership for Federal income tax purposes, or was in substance merely an individual proprietorship business of Sanford Hartman.

Section 704(e) of the 1954 Code deals with "family partnerships." It provides in paragraph (1) that a "person shall be recognized as a partner * * * if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person." The respondent's regulations recognize, explicitly, that trusts for minor children may be recognized as partners, for Federal income tax purposes. Income Tax Regs., sec. 1.704–1 (vii).

We think it is clear that the business of the Shafford Co. was one in which capital was a needed and income-producing factor. Beginning in its fiscal year February 1, 1955–January 31, 1956 (which roughly corresponds to Sanford Hartman's first taxable year here involved—calendar 1955), and thereafter the partnership carried inventories of merchandise in significant amounts. It also granted credit to its customers, to some for as much as 90 days. Its practice was to pay its salesmen commissions on the sales orders they obtained on the 15th of the month following the invoicing of the goods sold on such orders; and this meant that in numerous instances, the salesmen received their commissions well in advance of the partnership's receiving payment for the goods from its customers. Tables in our

Findings of Fact show that it had, in addition to its salesmen's commissions, other operating expenses (exclusive of amounts paid to Sanford as a partner) ranging from $50,000 upwards to $165,000 per year. To repeat, we think it abundantly clear that Shafford Co. required capital. It was in no way like those personal service businesses in which capital is not an income-producing factor.

The partnership books of account and the information returns which it filed, reveal that during the period here involved, 1955 through 1958, the trusts (as well, of course, as Sanford) had sizable capital investments in the partnership, built up in large part by the earnings of previous years which the trustees had permitted to remain in the business. As was pointed out in the case of *Henry S. Reddig*, 30 T.C. 1382, it must still be established that the trusts are the *real* owners of their capital interests, rather than merely owners *in form* of such interests. It is our opinion that, considering the evidence on this point, the trusts here were the real owners.

The trusts were largely represented in partnership affairs by trustee Kann, and the evidence shows him to have been in no way subservient to Sanford Hartman. Indeed, the evidence is that there were numerous occasions of disagreement, as to which Kann prevailed over Sanford. Moreover, the trusts, in addition to withdrawing sums from the trusts' capital accounts to pay their Federal income tax liabilities, also withdrew not insignificant amounts for investing in life insurance on the lives of the Hartman children and for investing in mutual funds. The record demonstrates that no withdrawals were made to furnish the support for these children that was due them from their parents.

It is worth noting, too, that the trustees, especially Kann, contributed vital services to the partnership. Indeed, if we were to attempt to identify the sparkplug that made the Shafford Co. the success that it was, we would, from the record here before us, accord the honor to Nathaniel Kann. As appears from our Findings of Fact, Slesinger and Henrietta Hartman were much less active than Kann, but they did to a limited degree contribute to the management of the partnership.

We have found as an ultimate fact, after a consideration and weighing of testimony of the witnesses and of all the other evidence, that during the taxable years 1955 through 1958, Shafford Co. was a valid partnership for Federal income tax purposes; that capital was an income-producing factor therein; and that Sanford and the trusts for his children were the members of said partnership. We here so hold. And from this it follows that Sanford Hartman is not to be charged with the distributive shares of the partnership income which were

allocated to the trust for Dana Lee Hartman and to the trust for James D. Hartman.

We decide this issue for the individual petitioners, Sanford and Henrietta Hartman.

4. The fourth and final issue is whether assessment and collection of any deficiency that might be held to be due and owing from the corporate or individual petitioners, are barred by the statute of limitations. Our holdings on the prior issues have been that neither of said petitioners is taxable with the additional income which the respondent charged to them and on the basis of which the deficiences are predicated. The determined deficiencies of course are eliminated as the result of those holdings. With their elimination, there is no longer an issue respecting the statute of limitations.

*Decisions will be entered under Rule 50.*