G & J INVESTMENT CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
G & J Inv. Corp. v. Commissioner
Docket No. 5689-71.
United States Tax Court
T.C. Memo 1973-231; 1973 Tax Ct. Memo LEXIS 58; 32 T.C.M. (CCH) 1091; T.C.M. (RIA) 73231; October 17, 1973, Filed Daniel C. George, for the petitioner. Frank C. Hider, Jr., for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioner's income tax of $5,000 for 1967 and $5,500 for 1968. The sole question is whether petitioner is precluded from claiming a separate corporate surtax exemption under section 269 or section 1551. [1]
*59 2 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner is a Florida corporation with its principal place of business in Cincinnati, Ohio, at the time of the filing of its petition herein. It filed its Federal income tax returns for the taxable years involved with respondent at Chamblee, Georgia. Petitioner was incorporated on December 28, 1961 by Gerald D. Keller (hereinafter Keller) as its president and controlling stockholder. Keller's experience in real estate investment began in 1945 and continues to the present. His real estate investments include buying, renovating, improving, management, and sales of apartments, commercial buildings, nursing homes, and land. Keller first became directly interested in the nursing home business on April 1, 1950 by purchase of a nursing home in Cincinnati, Ohio. Soon after this investment, Keller took in-service training in the administration of nursing homes and started building and buying more nursing homes as an investor and operator. On January 2, 1955, Keller and his wife purchased 51 percent of the issued and outstanding stock of Dade County Retreat, Inc. (hereinafter "Retreat"), *60 a 3 corporation engaged in the business of owning and operating a nursing home in Miami, Florida. In 1957 they purchased a 50-percent interest in Dade County Restorium, Inc. (hereinafter "Restorium"), a corporation engaged in the business of owning and operating another nursing home in the same county. Keller purchased the remaining 50-percent interest in Restorium on December 1, 1961. From the beginning of their operations, Retreat and Restorium were subject to frequent malpractice, workmen's compensation, and personal injury claims asserted by patients, employees, and visitors at these two nursing homes. Like other nursing homes in the area, Retreat and Restorium encountered major difficulties in obtaining adequate workmen's compensation and liability insurance coverage, particularly during the years 1958 through 1961. In 1961, an employee obtained a substantial judgment against Retreat for a workmen's compensation claim. The insurance company with which Retreat carried its workmen's compensation insurance had meanwhile gone into receivership. As a result of this claim and an inability to pay its debts, Retreat discontinued its operations in 1963. Commencing in 1961, *61 the employee who obtained the judgment against 4 Retreat also attempted to hold Restorium liable for the same claim, but this attempt was ultimately rejected in 1963. When petitioner was incorporated in 1961, it issued 16 shares of no-par-value stock with a reported fair market value of $500. These shares were held as follows: Position
Shares Gerald D. Keller
President
8
Juanita Keller (wife)
Secretary
7
James Thornton (nephew)
-
1
At a meeting on January 5, 1962, the directors and stockholders of Restorium unanimously adopted Keller's proposal that all property owned by Restorium and located in Dade County, Florida, together with all improvements and all furniture, furnishings, and equipment contained therein, be conveyed to petitioner. At a meeting on January 10, 1962, the directors and stockholders of petitioner adopted Keller's proposals that petitioner purchase all of Restorium's real property in Dade County, Florida, together with all improvements, furniture, furnishings, and equipment contained therein, and a residence owned by Keller in Coral Gables, Florida (hereinafter the Coral Gables residence). 5 At a meeting on January 14, 1962, the *62 directors and stockholders of petitioner authorized petitioner to purchase for $6,000 all furniture located in the Coral Gables residence. Keller and his wife agreed to wait for the $6,000 payment until such time as petitioner was able to make payment. Restorium transferred to petitioner on or about January 18, 1962 all of its real property owned and located in Dade County, Florida, together with all improvements and all furniture, furnishings, and equipment contained therein at their current book value or then adjusted basis. The depreciated book value or sales prices as reported on the 1962 income tax returns of Restorium and petitioner are as follows: Description
Book value Land
$ 79,902.20
Buildings
277,591.91
Equipment, fixtures, furniture, and other assets
79,683.91
All the property was transferred to petitioner subject to all outstanding mortgages, notes, and loans payable. The book value of all property exceeded the amount of all existing obligations on the property by approximately $165,000. Petitioner 6 paid no cash. To cover the excess value of $165,000, petitioner executed a demand note to Restorium with no rate of interest and secured *63 by an unrecorded mortage which was subordinated to all existing mortgages on the property. Petitioner has not completely paid this $165,000 note and as of the date of trial was still making payments on it. On or about January 18, 1962, Keller and his wife transferred the Coral Gables residence to petitioner. Petitioner assumed the first mortgage on the property in the amount of $35,000 and executed a second mortgage in the amount of $11,000 to the Kellers. During January 1962, the Kellers also transferred all the furniture located in the Coral Gables residence to petitioner in exchange for a note payable in the amount of $6,000. Commencing as of January 1, 1962, petitioner leased the property acquired from Restorium for a period of three years at a monthly rental of $9,000 with an option to renew for an additional three-year term on the same terms and conditions. The lease was renewed for an additional three-year period (1965 7 through 1967) [2] at a monthly rental of $9,500 and again for an additional three-year period (1969 through 1971) at a monthly rental of $10,000. The lessee was responsible for all repairs and insurance. The leases included all after-acquired *64 improvements, additions, and equipment the lessee used in its nursing home operation. Commencing in January 1962, petitioner leased back the Coral Gables residence to Keller and his wife for $3,600 per annum. The separate incorporation of petitioner and leaseback of the real estate used by Restorium in its nursing home business conformed to the same pattern used by Keller since 1957 in the other nursing home businesses he owned. 8 For the years 1962 through 1968, petitioner's operations may be summarized as follows: Year
Rents received from Restorium
Rents received from Keller
Gross rents
Other income
Net income before income taxes 1962
$108,000
$3,600
$112,101.02
-
$24,135.75
1963
108,000
3,600
111,869.22
-
24,729.08
1964
108,000
3,600
111,600.00
$ 116.83
16,592.01
1965
114,000
3,600
117,600.00
253.70
14,247.96
1966
114,000
3,600
117,600.00
-
31,565.89
1967
114,000
-
114,000.00
-
31,520.20
1968
114,000
-
114,000.00
44,505.74
70,904.43
*65 For the years 1958 through 1968, Restorium's operations may be summarized as follows: Year
Gross receipts
Net income before net operating loss
Net income before income taxes 1958
$ 45,451.24
$ 1,907.79
$ 1,907.79
1959
145,780.83
( 6,392.45)
( 6,392.45)
1960
287,904.55
(10,734.43)
(10,734.43)
1961
456,049.80
39,306.62
22,179.74
1962
497,421 .30
65,941.07
65,941.07
1963
510,464.39
23,876.19
23,876.19
1964
481,018.63
30,154.72
30,154.72
1965
493,429.78 7,213.41
7,213.41
1966
647,992.26
32,978.81
32,978.81
1967
808,390.54
90,698.83
90,698.83
1968
854,365.29
35,693.47
35,693.47 9 OPINION Respondent's position is that section 269 applies because "the principal purpose" of the acquisition of control of petitioner by the Kellers was to secure the benefit of an additional corporate surtax exemption and, alternatively, that under section 1551 the acquisition of property by petitioner from Restorium and the Kellers had as "a major purpose" the securing of such exemption. Both parties concede that if the proscribed statutory purpose exists, respondent must prevail. The issues are factual and the burden of proof *66 is on the petitioner, with the further requirement that in respect of section 1551 it must satisfy that burden by a clear preponderance of the evidence. Southern Dredging Corp., 54 T.C. 705 (1970); Beacon Auto Radiator Repair Co., 52 T.C. 155 (1969). Much of the evidence herein upon which respondent relies would be appropriate for consideration if the issue were whether petitioner should be considered a sham or whether some of petitioner's income should be allocated to Restorium under section 482. But respondent specifically renounced any argument based on "sham," and, as far as section 482 is concerned, that 10 section could be applied only if Restorium were a petitioner herein (which it is not) and only if respondent specifically relied on that section (which he has not). Sanford H. Hartman, 43 T.C. 105, 116 (1964); Burrell Groves, Inc., 16 T.C. 1163, 1169 (1951). We see no need to detail the various elements which lead us to the conclusion that the petitioner has not met is burden of proof. The fact is that the purported insulation against potential liability for claims arising out of the operations of the nursing home *67 has a hollow ring. Petitioner's assets were substantially, although indirectly, committed to the satisfaction of any such claims in view of the note for $165,000 which it gave to Restorium. While it is true that such insulation may have been effective as to any increase in the fair market value of the properties subsequent to their transfer to petitioner by Restorium, there is no evidence in the record to indicate that any such increase either occurred or was likely to occur. Petitioner's claim that the purchase leaseback arrangement made financing easier also has a hollow ring. Leases are a useful foundation for financing where the lessee is a successful and solidly 11 grounded business enterprise and, more importantly, where long-term leases are involved. Cf. David F. Bolger, 59 T.C. 760 (1973), on appeal (C.A. 3, August 13, 1973). Here the risks of Restorium's nursing home operations would obviously give a lender pause and the three-year term of the lease provided little assurance of an ongoing source of funds with which to make mortgage payments. On the other side of the coin, we have Keller's testimony that taxes were not a consideration in the formation *68 of petitioner or the transfer of properties to it. But we are not required to accept such testimony as gospel, and the timing of such formation and transfer, in the context of the fact that Restorium was clearly turning the corner in respect of realization of taxable income, casts serious doubt on such testimony. Cf. Beacon Auto Radiator Repair Co., supra.
We have serious doubts that this record would sustain a finding that the obtaining of the corporate surtax exemption was not "the principal purpose" of the formation of the petitioner, with the result that petitioner would be held not to have carried its burden of proof under section 269. In any event, we 12 are satisfied that petitioner has not sustained its negative burden of showing, by a "clear preponderance of the evidence," that the securing of that exemption was not "a major purpose" of its formation and the transfer of properties to it. Consequently, at the very least, section 1551 mandates the disallowance of the surtax exemption. Beacon Auto Radiator Repair Co., supra.
Decision will be entered for the respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended and as applicable to the taxable years involved. ↩
2. The commencement and termination dates specified in the first renewal lease are January 1, 1965 to December 31, 1968. Yet the lease states that it is "for the term of three (3) Years" and the gross rental of $342,000 (payable $9,500 per month) stipulated in the lease would likewise cover a period of only 36 months. A first renewal term of three years leaves a gap of one year between it and the second renewal lease, but neither party makes any point of this discrepancy and we do not believe it is material to the issue involved herein. ↩