T AND K MANUFACTURING, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; RAYMOND H. BUSHONG AND GWENDOLYN J. BUSHONG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
T & K Mfg., Inc. v. Commissioner
Docket Nos. 11780-82, 11781-82.
United States Tax Court
T.C. Memo 1986-603; 1986 Tax Ct. Memo LEXIS 2; 52 T.C.M. (CCH) 1259; T.C.M. (RIA) 86603; December 30, 1986. *2 In 1978 and 1979, petitioner-husband and another man owned, in equal shares, petitioner-corporation and a partnership. In 1978 and 1979, the corporation manufactured typewriter rollers under contract. One of the necessary steps in manufacturing typewriter rollers was rubber grinding. During 1978 and 1979, the corporation subcontracted the rubber grinding to the partnership, which in turn subcontracted the rubber grinding to an unrelated corporation. Respondent determined that the partnership's profits on the rubber grinding are dividends to petitioner-corporation's shareholders, and specifically disclaimed reliance on sec. 482, I.R.C. 1954. Held (1) The payments by petitioner-corporation to the partnership served a business purpose and were properly deductible as an item of cost of goods sold in computing petitioner-corporation's gross income. (2) Petitioner-husband's proportionate share of the partnership's profits on the rubber grinding operation are not dividends; they qualify as personal service income subject to the maximum tax. Sec. 1348, I.R.C. 1954. John H. Burson, for the petitioners. Grant A. Wolfe, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, *3 Judge: Respondent determined deficiencies in Federal corporate income tax against T and K Manufacturing, Inc., for 1978 in the amount of $15,881.21 and for 1979 in the amount of $28,478.19. Respondent determined deficiencies in Federal individual income taxes against Raymond H. Bushong and Gwendolyn J. Bushong for 1978 in the amount of $228.30 and for 1979 in the amount of $1,956.97. These two cases were consolidated for trial, briefs, and opinion. After concessions by both sides, the issues for decision are as follows: (1) Whether certain amounts paid in 1978 and 1979 by petitioner-corporation to a related partnership are deductible by petitioner-corporation. (2) Whether these amounts are dividends to petitioner-husband or are personal service income qualifying for the maximum tax under section 1348. [1]
FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases, petitioner T and K Manufacturing Inc. (hereinafter *4 sometimes referred to as "TKM"), had its principal place of business in Findlay, Ohio, and petitioners Raymond H. Bushong (hereinafter sometimes referred to as "Bushong") and Gwendolyn J. Bushong, husband and wife, resided in Findlay, Ohio. In 1978 and 1979, TKM's primary business was the manufacture of typewriter rollers. A typewriter roller is a small metal shaft with rubber rollers every few inches across the length of the shaft which hold the paper in place after the paper is threaded through the main carriage of a typewriter. In 1978 and 1979 (and during prior years), TKM manufactured a typewriter roller for Cooper Tire Company. Cooper Tire Company, in turn, was under contract during the same time period to provide the finished typewriter roller to IBM. TKM was the only company in the United States to manufacture this part for Cooper Tire Company or IBM. TKM's agreement with Cooper was oral, not written. During 1978 and 1979, Bushong and James C. Tesnow (hereinafter sometimes referred to as "Tesnow") each owned 50 percent of the outstanding common stock of TKM. During these same years Bushong and Tesnow were officers and directors of TKM, and their compensations were equal. *5 The following nine distinct steps were involved in manufacturing the typewriter rollers: (1) purchasing steel for the shafts; (2) cutting the steel; (3) grinding the steel; (4) turning the steel; (5) plating the steel; (6) assembling the rubber roller to an insert; (7) assembling the rubber roller and the insert onto the metal shaft; (8) grinding the rubber; and (9) washing, inspecting, and packaging. Step (5), plating the steel, involves plating, or coating, the steel shaft of the typewriter roller with a chrome or nickel type metal. Before July 1, 1979, this operation was not performed by TKM but was performed for TKM by other parties under contract. Step (8), grinding the rubber, involves shaping and polishing the rubber so that it is able to move smoothly on the typewriter cylinder. This process has never been performed by TKM. On May 25, 1977, TKM received a letter from the International Representative of the Amalgamated Clothing and Textile Worker's Union, AFL-CIO, CLC (hereinafter sometimes referred to as "the Union"), requesting TKM to recognize the Union as the collective bargaining representative of TKM's employees, and requesting the collective bargaining negotiations *6 be undertaken immediately. TKM employed about 20 people in production and maintenance work. On June 7, 1977, the National Labor Relations Board notified TKM that the Union had filed a Petition for Certification of Representative. The Union was successful by one vote in unionizing the company. TKM entered into a contract with the Union on November 23, 1977. About November 1, 1977, Tesnow and Bushong began operating a partnership under the name of T & B Enterprises (hereinafter sometimes referred to as "T & B"). Tesnow and Bushong entered into a written partnership agreement and each partner contributed $31,000 to the partnership. In 1977, 1978, and 1979 Tesnow and Bushong shared the profits and losses of, and owned the capital of, T & B equally. T & B was formed to own and operate real estate, lease equipment, perform machine shop work, perform plating operations, and do fabrication of welding. T & B owned more than 5 acres of land upon which were located seven buildings. Two of the buildings were leased to TKM, some of the others were leased to other companies. In one of the buildings T & B used five to six thousand square feet to perform the plating operation for TKM. During *7 1979, T & B also owned several vans and leased them to TKM. T & B kept its own set of books and had its own bank account. Before T & B was formed, TKM subcontracted the plating process to Bastian Plating Company by an oral agreement. When T & B was formed, it acquired equipment to do the plating process. During 1978 and up to July 1, 1979, T & B performed the plating process for TKM. T & B charged TKM the same prices for plating that Bastian Plating Company had charged TKM. During 1978 and 1979, all seven of T & B's employees worked in T & B's machine shop on the plating process and all of them were nonunion employees. Before November 1977, TKM subcontracted the rubber grinding process to Hoppenberg Machine Company (hereinafter sometimes referred to as "Hoppenberg") by an oral agreement. Tesnow's father, Ervin A. Tesnow, owned the majority of Hoppenberg's stock and about one-third of TKM's common stock. After Ervin A. Tesnow's death, in August 1977, his daughters received his interest in Hoppenberg as part of a distribution of his estate. In October 1977, substantially all of Hoppenberg's assets were sold to Blanchard Machine Company (hereinafter sometimes referred to as "Blanchard"), *8 which was incorporated on October 12, 1977. In performing rubber grinding, special grinding machines are needed because of the number of rubber rollers on a shaft, the spacing of the rubber rollers, and the precision required. The rubber grinding machines used by Hoppenberg were designed and developed primarily by Tesnow, Bushong, and Ervin A. Tesnow. It took more than a year for them to develop the machines. Before his death, Ervin A. Tesnow had given Tesnow and Bushong three grinding machines and a dust collector. There were no other similar grinding machines in the country. The only similar grinding machine was in Brazil and had been built by Tesnow and Bushong. When T & B was formed, the rubber grinding machines were given to T & B and were set up in the building used by T & B for the plating operation. The machines were wired and the dust collector was installed. No actual rubber grinding was ever done on the machines, however, and an air compressor needed to do the rubber grinding was never acquired by T & B. After Blanchard acquired substantially all of the assets of Hoppenberg, Tesnow told Blanchard that T & B was going to provide the rubber grinding services for TKM. *9 Blanchard then responded with a request that it be allowed to subcontract the rubber grinding from T & B. After several meetings between Tesnow and Blanchard it was agreed that Blanchard would subcontract the rubber grinding work from T & B. T & B invoiced TKM for the rubber grinding at the same rate that Hoppenberg had charged TKM. Blanchard charged T & B at a lower rate than Hoppenberg had charged TKM. T & B's income included the differential between the cost of having Blanchard perform the grinding and the price it sold the grinding services to TKM. During 1978 and 1979, the rubber grinding machines that Blanchard used under its subcontract were owned by IBM. Bushong and Tesnow serviced these machines at Blanchard when problems arose. In 1978 T & B invoiced TKM $103,858.54 for rubber grinding services, and in 1979 T & B invoiced TKM $147,360.34 for rubber grinding services. T & B made profits on the rubber grinding of $23,475.25 in 1978 and $42,432.22 in 1979. TKM reported its subcontracting expenses on its 1978 and 1979 tax returns as "Other costs" in determining its cost of goods sold. OPINION Respondent contends that the amounts TKM paid to T & B in 1978 and 1979 that *10 represent the profit T & B made on the grinding services, [2] were not made for a valid business purpose and, therefore, are not deductible as business expenses under section 162. Respondent further contends that these amounts were received by the shareholders of TKM as distributions out of TKM's earnings and profits for 1978 and 1979. Petitioners contend that (a) T & B was organized in light of the perceived danger that a strike at TKM would threaten TKM's existence; (b) T & B was organized in order to conduct business operations free from this perceived danger; (c) TKM subcontracted the rubber grinding services to T & B in pursuance of this purpose; (d) TKM paid to T & B no more for the rubber grinding services than TKM had previously paid to Hoppenberg; and (e) TKM's payments to T & B were for a proper business purpose and not as a distribution of TKM's *11 profits to its shareholders. Petitioners alternatively maintain that if the amounts are nondeductible as lacking in business purpose, they are nonetheless deductible as an ordinary and necessary business expense under section 162 as salary paid for Tesnow's and Bushong's personal services. We agree with petitioners' conclusions, although not with their analysis. In analyzing the instant cases, it may be helpful to first note what these cases are not about. Respondent does not contend that T & B's separate existence should be ignored; respondent does not propose to collapse T & B into TKM. (See n. 2, supra, as to respondent's retreat with regard to T & B's profits on the plating subcontract.) Also, respondent specifically disavows any reliance on section 482, which authorizes him to "allocate gross income [or] deductions * * * between * * * [commonly controlled] organizations, trades, or business, if * * * such * * * allocation is necessary in order * * * clearly to reflect the income of any of such organizations, trades, or businesses." Finally, although the parties appear to frame the main issue under section 162, we believe that the main issue is properly under section 61(a)(2), *12 as described infra.
I. Deduction for Cost of Rubber Grinding Services
Under section 61(a)(2), [3] gross income includes "Gross income derived from business". Section 1.61-3(a), Income Tax Regs., provides that "In a manufacturing * * * business, 'gross income' means the total sales, less the cost of goods sold, * * *". It has been said that "as to manufactured goods, the distinction [between costs and deductions] is often technical and economically obscure." Hofferbert v. Anderson Oldsmobile,197 F.2d 504, 506 (CA4 1952). Nonetheless, it is clear that direct costs incurred in the manufacture of an item to be sold are included in computing the cost of goods sold. Estate of Johnson v. Commissioner,42 T.C. 441, 444 (1964), affd. 355 F.2d 931 (CA6 1965); See Hahn v. Commissioner,30 T.C. 195 (1958), affd. 271 F.2d 739 (CA5 1959). To this end, a manufacturer is required to "include as inventoriable costs all direct production costs and, to the extent provided by paragraphs (c) and (d) of this section, all indirect production costs." Section 1.471-11(a), Income Tax Regs.[4] Direct production costs are "those costs which are incident to and necessary for production or manufacturing operations *13 or processes and are components of the cost of either direct material or direct labor." Section 1.471-11(b)(2)(i), Income Tax Regs. The costs incurred by TKM in having the rubber ground are *14 direct costs that are incident to and necessary for the production and manufacture of the typewriter roller. As a result, these costs are a part of TKM's cost of goods sold and are deductible from gross receipts in computing gross income under section 61(a)(2). Section 1.61-3(a), Income Tax Regs.TKM reported these costs in this manner on its tax returns. Since the cost of having the rubber ground is a part of TKM's cost of goods sold, section 162 is not needed for TKM to deduct these costs. Therefore, since section 162 is not needed for TKM to deduct these costs, we need not decide whether T & B's profit portions of the amounts TKM paid to T & B qualify for deductions under section 162. It is clear, however, that if a corporation makes payments ostensibly for costs of goods sold which are in reality dividends, then there is no deduction from gross receipts in computing gross income for these payments. Emmerson v. Commissioner,44 T.C. 86 (1965). Our inquiry then becomes one of determining whether the amounts in issue are in reality dividends. Respondent contends that the payments are in reality dividends since the payments served no business purpose. We do not agree. It is well-established *15 that taxpayers may arrange their business affairs as they wish. E.g., Eli Lilly & Co. v. Commissioner,84 T.C. 996, 1126-1127 (1985), and cases cited therein. There is no obligation to arrange one's affairs such that the Treasury is most enriched. Gregory v. Helvering,293 U.S. 465, 469 (1935). Moreover, what the taxpayers did, rather than what they might have done, controls their liability. Frank Lyon Co. v. United States,435 U.S. 561, 576-577 (1978). After the Union took steps to organize TKM, Tesnow and Bushong decided to perform various operations in the form of a partnership. T & B was a valid partnership performing several business purposes. T & B had its own employees, kept its own set of books and had its own bank account. The plating operation was performed by T & B, several buildings were owned and leased by T & B, and T & B leased out vans to TKM. In addition, T & B had the capability to perform the rubber grinding operation. Tesnow and Bushong had the technical ability to perform the rubber grinding operation. Before Blanchard began performing the rubber grinding operation, Hoppenberg had performed the operation. The machines used by Hoppenberg had been designed *16 by Ervin A. Tesnow, Bushong, and Tesnow. Tesnow and Bushong also built a rubber grinding machine being used in Brazil. T & B had the capacity to perform the rubber grinding operation. T & B had three rubber grinding machines that had been wired for operation and a dust collector in the building used for the plating operation. While it is true that an air compressor was needed in addition to these items to begin rubber grinding operations, we do not believe that the acquisition of as common a piece of equipment as an air compressor poses a serious impediment to beginning a rubber grinding operation. Tesnow and Bushong had the management ability to perform the rubber grinding. They successfully managed about 20 employees working at TKM. In addition T & B employed several people in the plating operation. The fact that T & B was able to negotiate a favorable subcontract for the rubber grinding further attests to Tesnow's and Bushong's business skills. T & B at all times was responsible for performing the rubber grinding services. Tesnow's and Bushong's placing of this responsibility in T & B made good business sense and served valid business purposes. We are not inclined to substitute *17 our business judgment for theirs. The record establishes that T & B was a valid partnership with several valid business purposes and not a mere sham. The payments made by TKM to T & B were for rubber grinding services which were received by TKM. T & B negotiated the contract with Blanchard and remained responsible for the performance and delivery of the rubber grinding service. Under these circumstances, respondent's reliance on lack of business purpose is misplaced. [5] *18 Hospital Corp. of America v. Commissioner,81 T.C. 520, 585-586 (1983). See Hartman v. Commissioner,43 T.C. 105, 117-118 (1964). It is well settled that respondent's determinations may be affirmed for reasons other than those assigned in the notice of deficiency. E.g., Estate of Finder v. Commissioner,37 T.C. 411, 422-424 (1961). However, we note that respondent has stated specifically that he is not relying on section 482. Furthermore, respondent has not contended that the payments for the services are in fact dividends under section 301 by virtue of their being unreasonable in amount. See e.g., Honigman v. Commissioner,466 F.2d 69, 74 (CA6 1972), affg. on this issue and revg. on another issue 55 T.C. 1067 (1971); section 1.301-1(j), Income Tax Regs. If respondent had taken either of these approaches, then we would have had a question of arm's-length pricing or fair market value and presumably we would have had a different record. Since respondent did not take either of these approaches, we do not believe it is appropriate to fault petitioners for the lack of valuation evidence in the record. See Riss v. Commissioner,56 T.C. 388, 400-401 (1971), *19 supp. op. 57 T.C. 469, 472-474 (1971), affd. on this issue sub nom. Commissioner v. Transport Mfg. & Equip. Co.,478 F.2d 731, 734-736 (CA8 1973), and remanded on other issues 478 F.2d 1160 (CA8 1973); Hartman v. Commissioner,43 T.C. at 116. We conclude that no part of TKM's payments to T & B constitute dividends. Respondent's analysis of the situation seems to be bottomed on a determination to ignore Bushong's testimony. Respondent states that "there is no credible evidence in the record that indicates why the rubber grinding services were offered by Blanchard * * * at a price which was lower than that formerly charged by Hoppenberg". We have found that Tesnow told Blanchard that T & B would provide the rubber grinding services. T & B had the machines; T & B had the place for the machines; and Tesnow and Bushong had designed, developed, and serviced such machines. T & B had taken over another subcontracted operation, the plating process. We believe, on the basis of Bushong's credible testimony, that Blanchard responded to a credible threat of competition. Respondent relies on a number of opinions for his business purpose argument. None of those opinions helps him in the instant *20 case. In Kocin v. United States,187 F.2d 707 (CA2 1951), the taxpayer corporation sought to deduct commissions paid to a partnership which had been formed to take over the selling functions previously performed by the taxpayer. "The general partners were officers and stockholders of the taxpayer, the special partners were salesmen who had formerly been in the employ of the taxpayer. * * * [T]he partnership served no business purpose. * * * it could be called a 'sham'". 187 F.2d at 708. In the instant cases, T & B had a separate existence, it conducted a number of activities (including the plating process, TKM's payments for which are no longer challenged by respondent), and it did not take over an activity formerly carried on by TKM. T & B -- not TKM -- had the rubber grinding machines and so had the credible threat of competition that caused Blanchard to lower its rates. TKM had previously paid for the rubber grinding services and it continued to pay for them at the same rates. T & B was not a sham. Respondent also relies on Valley Camp Coal Co. v. Commissioner,405 F.2d 1208 (CA6 1969), affg. a Memorandum Opinion of this Court. [6] Valley Camp was lessee of a coal mine owned *21 by Wheeling Steel. Valley Camp agreed to buy the mine, but it was decided that title would be held in a nonoperating subsidiary of Valley Camp. Valley Camp gave the subsidiary the funds to buy the mine. We, and the Court of Appeals, held that this was governed by Commissioner v. Court Holding Co.,324 U.S. 331 (1945), that Valley Camp should be treated as the true owner of the mine, and that it followed that Valley Camp was not permitted to deduct the royalties that it paid to its subsidiary. Respondent does not contend that the instant cases are governed by Court Holding Co. T & B was an operating entity, unlike Valley Coal's subsidiary. Respondent does not contend that TKM should be treated as the true owner of T & B's rubber grinding machines, or that TKM was the true performer of the rubber grinding process. We hold, for petitioners, that TKM is entitled to deduct from its gross receipts in computing its gross income, the entire amounts it paid to T & B in 1978 and 1979. II. Personal Service Income
Respondent determined that, since the payments made by TKM to T & B that represent T & B's profit on the rubber grinding services were dividends, these amounts *22 did not qualify for the maximum tax on personal service income provided by section 1348. Since we hold that these amounts were not dividends, thereby disagreeing with respondent's predicate, we hold for petitioners on this issue. [7]
Because of petitioners' concessions on other matters, Decisions will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. In the notices of deficiency, respondent treated plating process profits the same way as the rubber grinding process profits. At trial, respondent conceded the matter as to the plating process profits. As a result, respondent conceded $6,622.75 of the $30,098 adjustment for 1978 and $13,499.78 of the $55,932 adjustment for 1979.↩
3. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. -- Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (2) Gross income derived from business; ↩
4. Cost of goods sold is computed by taking the tax basis of the inventory at the beginning of the year, adding the cost of merchandise purchased for sale plus the direct and indirect production costs involved in manufacturing inventory during the year, and subtracting from the sum the tax basis of the inventory at the end of the year. Peninsula Steel Products & Equip. v. Commissioner,78 T.C. 1029, 1053 (1982); 2 J. Mertens, Law of Federal Income Taxation, sec. 16.01, p.2 (1986). Respondent possesses broad discretion to determine whether a method of accounting for inventories clearly reflects income. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 532 (1979); see Peninsula Steel Products & Equip. v. Commissioner,78 T.C. at 1044↩.
5. Respondent's argument here is analogous to the one made in Hospital Corp. of America v. Commissioner,81 T.C. 520 (1983), where we stated (at 585-586): Respondent's contention that LTD is a sham is based primarily on his assertion that petitioner could have negotiated and performed the contract itself. The question is not whether petitioner could have, but whether it in fact did. We are satisfied that while petitioner's officers and representatives were wearing multiple hats, before the KFSH contract was finally negotiated, these individuals were acting in their capacity as officers and directors of LTD. The fact that these same individuals were also officers and directors of petitioner is not sufficient reason for us to disregard the corporate existence of LTD. * * *
6. T.C. Memo. 1967-225↩.
7. Respondent has not raised, and we do not address, other possible theories on this issue.↩