Ransom W. Chase and Virginia S. Chase, et al. [1] v. Commissioner. Chase v. Commissioner
Docket Nos. 1320-63, 1369-63 - 1374-63. 2.
United States Tax Court
T.C. Memo 1965-202; 1965 Tax Ct. Memo LEXIS 130; 24 T.C.M. (CCH) 1054; T.C.M. (RIA) 65202; July 23, 1965
*130 Held: On the facts, patents sold by Curtiss-Wright were purchased by partnership and licensed to Corporation. Held, Further: Corporation entitled to deduct as ordinary and necessary business expenses entire royalty payments made to partnership. Held Further: Amounts received by partnership from Corporation were not disguised dividends. Ransom W. Chase, for the petitioners in Docket No. 1320-63. Robert M. Barton, E. Talbot Callister, and Robert A. Smith, 4th Floor, Wilshire-Grand Bldg., 611 Wilshire Blvd., Los Angeles, Calif., for the petitioners in Docket Nos. 1369-63, 1370-63, 1371-63, 1372-63, 1373-63, and 1374-63. Marion *131 Malone, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies in petitioners' income taxes as follows: Taxable Year
Docket No.
Ended
Amount
1320-63
Ransom W. and Virginia S. Chase
12/31/54
$ 2,666.70
12/31/55
1,666.74
12/31/56
1,649.52
1369-63
Caleb Armistead and June Jaquith Motz
12/31/55
15,975.66
12/31/56
13,985.89
1370-63
June Jaquith Motz
12/31/54
2,298.58
1371-63
Estate of Charles S. Gass, Deceased, Sarah E. Gass, Ex-
12/31/54
9,949.43
ecutrix, and Sarah E. Gass
12/31/55
9,732.25
12/31/56
8,656.27
1372-63
Caleb Armistead Motz
12/31/54
2,298.58
1373-63
Louis D. and Anna O. Statham
12/31/53
36,439.79
12/31/54
84,710.80
12/31/55
96,723.10
12/31/56
101,781.61
1374-63
Statham Instruments, Inc. (Formerly Statham Labora-
5/31/54
97,068.63
tories, Inc.)
5/31/55
100,419.84
5/31/56
110,765.23
The parties have agreed to certain adjustments with respect to the deficiencies. The remaining issues for decision are: (1) Whether Statham Instruments, Inc., can deduct, during the years in issue, "royalty" *132 payments made to Transducer Patents Company, a limited partnership, as ordinary and necessary business expenses. The answer to this issue is dependent upon the answer to two subsidiary questions: (a) Whether certain patents sold by Curtiss-Wright were purchased by Transducer Patents Company or Statham Instruments, Inc., and (b) Whether the payments made to the partnership by the corporation, even if they are considered "royalties," were reasonable in amount; and (2) Whether the amounts received by the individual partners of Transducer Patents Company from the partnership stemming from the payments made to the partnership by Statham Instruments, Inc., are taxable as "royalty" payments or "dividends." Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners Ransom W. Chase (hereinafter sometimes referred to as Chase) and Virginia S. Chase are husband and wife with business address at 411 West 5th Street, Suite 910, Los Angeles, California. They filed joint Federal income tax returns on the cash method of accounting for the calendar years 1954, 1955, *133 and 1956 with the district director of internal revenue at Los Angeles, California. Petitioners Caleb Armistead Motz (hereinafter sometimes referred to as Motz) and June Jaquith Motz are husband and wife who presently reside at 1055 Eastern Point Road, Groton, Connecticut. From 1954 through 1956 they resided at 101 South Highland Avenue, Los Angeles, California. For the year 1954 each filed separate Federal income tax returns, and for 1955 and 1956 they filed joint Federal income tax returns, all on the cash method of accounting, with the district director of internal revenue, Los Angeles, California. Charles S. Gass and Sarah E. Gass were husband and wife during 1954, 1955, and 1956, and resided at 9881 Carmelita Avenue, Beverly Hills, California. They filed joint Federal income tax returns for those years on the cash method of accounting with the district director of internal revenue at Los Angeles, California. Charles S. Gass is now deceased, and Sarah E. Gass, as executrix of the estate of Charles S. Gass, and Sarah E. Gass, individually, are the petitioners in Docket No. 1371-63. Petitioners Louis D. Statham (hereinafter sometimes referred to as Statham) and Anna O. Statham *134 are husband and wife who reside at 10236 Charing Cross Road, Los Angeles, California. They filed joint Federal income tax returns on the cash method of accounting for the calendar years 1953 through 1956 with the district director of internal revenue, Los Angeles, California. Petitioner Statham Instruments, Inc. (hereinafter sometimes referred to as Corporation) is a corporation organized under California law in 1946 under the name of Statham Laboratories, Inc. Its business address is 12401 West Olympic Boulevard, Los Angeles, California. In 1957 its name was changed to Statham Instruments, Inc. It maintains its books and records on an accrual method of accounting and reports its income on a fiscal year basis ending May 31 of each year. It filed corporation Federal income tax returns for each of the fiscal years ending May 31, 1952, through May 31, 1956, with the district director of internal revenue at Los Angeles, California. Statham was an employee of Curtiss-Wright Corporation (hereinafter sometimes referred to as Curtiss-Wright) from February 1943 until September 7, 1943. While in that employment he began working on the development of a new means of making accurate measurements *135 of air pressure by use of a transducer design embodying the unbonded strain gauge as its principal feature. The type of transducer upon which he worked was designed to convert physical energy into a measurable electrical signal of great accuracy. In September 1943 Statham discontinued his employment with Curtiss-Wright and formed a partnership with his wife, who was not active in the technical side of the business. The partnership was known as Statham Laboratories (hereinafter sometimes referred to as Laboratories). It made and sold transducer devices to Curtiss-Wright and operated under an agreement called "Underlying Agreement." The agreement provided, among other things, that all inventions, and the patent applications and patents issued therefor, became the property of Curtiss-Wright. Statham thereafter assigned to Curtiss-Wright certain claims embraced in the patent applications and letters patent derived from the transducer inventions upon which he was working. The inventions resulted in six patent applications for which five letters patent were eventually issued. On or about March 9, 1945, Statham in his individual capacity and Laboratories entered into a new agreement with *136 Curtiss-Wright. That agreement (hereinafter called Curtiss-Wright license) provided for the licensing by Curtiss-Wright to the Stathams of the nonexclusive rights to make and sell transducer devices using the Curtiss-Wright inventions. The Stathams and Curtiss-Wright thereafter operated under that agreement until Corporation was organized in 1946. Under the Curtiss-Wright license, the licensee was given a nonexclusive right to make and sell at a royalty rate of 5 percent payable to the licensor. Corporation was organized on June 6, 1946, and took over the partnership business of Laboratories. Corporation was closely held until 1957. The stockholders thereof and their respective stock interests were as follows for the period January 1, 1952, through May 31, 1956: Name
Shares Owned
Louis D. Statham
9,720
Anna O. Statham
9,000
C. A. Motz
1,800
S. E. Gass
2,000
[1] Gifford White 1,800
C. S. Gass
1,000
Stanley Barnes
90
R. W. Chase
90
In 1957 a public offering of some of Corporation's stock was made. Thereafter, *137 Corporation has been at all times relevant a publicly-held company. Its shares are traded on the American Stock Exchange and certain other exchanges throughout the country. The directors and officers of Corporation from June 1, 1951, through May 31, 1956, were as follows: Fiscal Yr.
Beginning
June 1
Directors
Officers
1951
Ransom W. Chase
Louis D. Statham, President
Caleb A. Motz
S. E. Truslow, Vice-president
Gifford E. White
Ransom W. Chase, Secretary
S. E. Truslow
Gifford White, Treasurer
Louis D. Statham
1952
Ransom W. Chase
Louis D. Statham, President
Caleb A. Motz
S. E. Truslow, Vice-president
Gifford E. White
Ransom W. Chase, Secretary
(resigned 5/23/52)
Gifford E. White, Treasurer
Charles S. Gass
(resigned 5/23/52)
(from 10/18/52)
Charles S. Gass, Treasurer
S. E. Truslow
(from 10/18/52)
Louis D. Statham
1953
Ransom W. Chase
Louis D. Statham, President
1954
Caleb A. Motz
S. E. Truslow, Vice-president
1955
Charles S. Gass
Ransom W. Chase, Secretary
1956
S. E. Truslow
Charles S. Gass, Treasurer
Louis D. Statham
Corporation took over the business of the Stathams' partnership, but the rights *138 of the Stathams in the Curtiss-Wright license were not actually assigned. On or about June 15, 1946, Corporation and Laboratories entered into an "Agency Agreement" so dated. Statham in his individual capacity was not a party to the agreement. The "Agency Agreement" authorized Corporation to manufacture and sell the devices without actually being the assignee of the rights the Stathams held in the 1945 Curtiss-Wright agreement. Corporation operated under the agreement as though it were the licensee under the Curtiss-Wright license, and neither Statham in his individual capacity nor Laboratories continued in business thereafter. The inventions covered by the Curtiss-Wright license became the subject of five patents issued by the United States Patent Office to Curtiss-Wright. These patents (hereinafter called Curtiss-Wright patents) are numbered and were dated and issued as follows: Patent No.
Date of Issue
2,453,601
11/ 9/48
2,455,883
12/ 7/48
2,530,184
11/14/50
2,573,285
10/30/51
2,573,286
10/30/51 Four of the patents covered transducer designs employing unbonded strain gauges and the fifth one was for an electronic circuit useful with such transducers. *139 During the calendar years 1952 through 1956, Corporation manufactured and sold as its principal product line a variety of transducers using features covered by one or more of the Curtiss-Wright patents. Prior to April 1948, Corporation was notified by Roy W. Carlson (hereinafter referred to as Carlson) that in his opinion the Carlson patents were being infringed by Corporation, which was then well into the business of manufacturing and selling transducers of the sort covered by the transducer inventions. Corporation thereupon sought and obtained an exclusive license from Carlson. The Carlson patents related to inventions covered by United States letters patent owned by Carlson numbered 2,059,549 and 2,036,458, issued November 3, 1936, and April 7, 1936. The Carlson patents were dominant patents. Corporation was of the opinion that it could not successfully manufacture the devices covered by the Curtiss-Wright patents without infringing the Carlson patents. The Carlson designs were a part of the more sophisticated technology of the Curtiss-Wright patents. Under the Carlson license, Corporation received an exclusive license from him to make, use, and sell transducers covered by his *140 patents. For this Carlson was to be paid a royalty at the rate of 3 percent of sales. In the period between its formation and January 1, 1952, Corporation made substantial sales of transducers covered by the Curtiss-Wright patents and the Curtiss-Wright license. During that period and until the latter part of 1953, many transducers made were also covered by patents owned by Carlson. During the period between the incorporation of Corporation in 1946 and the date of issuance of the last of the Curtiss-Wright patents on October 30, 1951, the scope and extent of Corporation's patent protection was uncertain. It was operating as exclusive licensee under the Carlson patents and under the nonexclusive Curtiss-Wright license which covered the patent applications owned by Curtiss-Wright. Even after the issuance of the last patent, Philip Subkow (hereinafter referred to as Subkow), the patent lawyer for Corporation, advised that there remained various uncertainties about the royalties owing and the interpretation of the patent claims and the Curtiss-Wright license involving some highly technical aspects of patent law. In December 1951, he recommended to Corporation that it contact Curtiss-Wright *141 and settle the relationship. In addition, he pointed out that the basic Carlson patents were to expire in April and November of 1953. He felt that upon such expiration the patent position of Corporation would be vulnerable. With the umbrella of the Carlson patents removed, he pointed out that Curtiss-Wright would be free to license possible competitors of Corporation because the Curtiss-Wright license was nonexclusive. He urged that Corporation get an exclusive license from Curtiss-Wright on the Curtiss-Wright patents. The management of Corporation was concerned about the loss of its Carlson patent shelter and the possibility of new competition upon the expiration of the Carlson patents. At this time the Curtiss-Wright patents would become dominant. The concern was acute because extensive Government procurement was then taking place to meet the national defense needs. Practically all of Corporation's sales were then being made to the Government, directly or indirectly, for use in flight testing experimental military airplanes. That activity was then on the upsweep, particularly by reason of the then pending Korean war. The Statham transducers were mainly used for measurement of *142 air pressure over the airfoils of each test plane. The management of Corporation foresaw as possible competitors Radio Corporation of America, Westinghouse Corporation, and Minneapolis-Honeywell. Statham was then of the opinion that almost any company in an electro-mechanical capacity, with a license from Curtiss-Wright, could have presented formidable competition. In January 1952, Gifford White (hereinafter referred to as White), then vice-president and treasurer of Corporation, paid a visit to the Wood-Ridge, New Jersey, headquarters of Curtiss-Wright and discussed with its patent department the possibility of converting the nonexclusive license then held by Corporation into an exclusive license. He received an indication that Curtiss-Wright was willing to negotiate and so reported to the management of Corporation. In February 1952, Corporation commissioned Subkow to travel to Wood-Ridge and negotiate with Curtiss-Wright. He was instructed by the management to seek an exclusive license in place and stead of the nonexclusive license, and to seek further a release of Corporation from possible prior liabilities to Curtiss-Wright. He was instructed specifically that he was not *143 to commit Corporation to a large fixed-sum liability, and was to negotiate only, if he could, for an exclusive license on a percentage royalty basis. Subkow immediately went to Wood-Ridge and met and negotiated with William E. Valk (hereinafter referred to as Valk), then corporate patent attorney for Curtiss-Wright, and with Kenneth M. Lane (hereinafter referred to as Lane), then a division patent attorney for Wright Aeronautical Division of Curtiss-Wright. Negotiations and discussions were held for at least three days, although not necessarily consecutive. During the first day of the negotiations, Subknow bargained for an exclusive license in exchange for a percentage royalty. The possibility of a purchase or sale of the patents was not mentioned during that first day. Curtiss-Wright refused to grant an exclusive license for certain tax and policy reasons, which were then told to Subkow. Lane had no reason to believe that the Statham management had any prior knowledge or awareness of the policy reasons underlying Curtiss-Wright's refusal to grant exclusive licenses. Since Curtiss-Wright refused to consider the possibility of an exclusive license, the suggestion was made that Corporation *144 buy the patents from Curtiss-Wright. Subkow, in order to avoid a cash purchase obligation, attempted another solution. He suggested that Curtiss-Wright consider an absolute sale of the patents to Corporation in return for a purchase price payment of a running percentage of sales. This proposal was rejected by Curtiss-Wright, which made a counterproposal of a sale of the patents to Corporation for a cash consideration of $130,000 to be paid in two or three installments over a three-year period. Subkow, at his hotel in New York, reported this offer to White in Los Angeles by telephone. White, in behalf of Corporation, told Subkow that any purchase on a lump sum of money basis was unacceptable and to renew his efforts to acquire patent protection on a royalty basis. Subkow then reported to Curtiss-Wright, after communicating with his principals, that Corporation could not undertake such a sizeable payment because such an obligation for the patents would reduce its borrowing capacity below that required for its expansion program. Valk then suggested a sale at a total price of $135,000, payable $35,000 down and $25,000 in four subsequent annual installments. The $135,000 proposal *145 contemplated more liberal payment provisions - payments extended over five years instead of over three years as contemplated in the $130,000 offer. Subknow again telephoned White and related the terms of the $135,000 offer. White informed Subkow that such offer was still unacceptable to Corporation but that management would see if some alternative could be developed. Later that same day, White telephoned Subkow and informed him that a group of the shareholders of Corporation might become the purchaser of the patents, that the composition of the group was not yet fully determined, and that Subkow should attempt to complete negotiations on the basis of a third party being the purchaser if he could. Subkow returned to the negotiations and proposed that the sale be to a third party which would be a partnership or joint venture composed largely of the stockholders of Corporation. Curtiss-Wright agreed to this proposal, provided there were sufficient protective provisions in the agreement, and the necessary agreements were then drafted on the proposed basis, but with the name of the purchaser left blank. Meantime, Chase began to draft the necessary documents to form the partnership. *146 Drafts of the sale agreement were exchanged between the parties, and prior to the execution of it, the third party purchaser was identified to Curtiss-Wright as Transducer Patents Company (hereinafter referred to as the partnership), a partnership consisting of the major stockholders of Corporation. The names of the partners were furnished to Curtiss-Wright. The partnership executed a certificate of limited partnership on March 13, 1952, and caused it to be recorded in the Office of the County Recorder of Los Angeles County on March 14, 1952, in Book 38481 at page 287 of the Official Records of Los Angeles County. On March 19, 1952, the partnership published a fictitious name certificate. The recorded instrument recited the existence of the partnership, named its members, their respective interests and their initial cash contributions of $35,700. It also indicated that the partners agreed to contribute an additional $100,000 to the partnership over a four-year period. The partnership consisted of Statham as general partner and the following persons as limited partners: Statham, his wife, Anne Elizabeth Statham (their daughter), Chase, Sarah E. Gass, White, and Motz. One day after *147 the agreement was made, Charles S. Gass became a partner by assignment from his wife, Sarah E. Gass, of a portion of her limited partnership interest. An amendment to the Certificate of Limited Partnership was signed by all partners on March 14, 1952, to show the admission of Charles S. Gass. It, too, was recorded. The partners, their respective interests in the partnership, and the initial amounts of cash which each partner contributed in March 1952 as the initial contribution in the partnership are as follows: Initial
Partner
Interest
Cash
Louis D. Statham
15/85
$ 6,300
Anna O. Statham
15/85
6,300
Anne Franson
(Anne Statham)
30/85
12,600
C. A. Motz
6/85
2,520
Sarah E. Gass
5/85
2,100
Charles S. Gass
5/85
2,100
Gifford E. White
6/85
2,520
Ransom W. Chase
3/85
1,260
Each partner's contribution came from his own resources. The initial contributions, aggregating $35,700, were deposited in a partnership bank account at Security First National Bank, Beverly Hills Branch, on March 14, 1952. On or before March 14, 1952, Security First National Bank loaned $6,000 each to Statham and Anna O. Statham, his wife, and $12,700 to Anne E. *148 Statham, their daughter. The partnership kept its books and filed its information income tax returns on the cash method of accounting. Its returns were filed on a fiscal year basis ending on the last day of February. Its first fiscal year ended February 28, 1953. Each such return was filed with the district director of internal revenue, Los Angeles, California. Before the public offering of shares, the percentage of shares owned and the percentage of partnership interest owned were substantially the same as to each married couple (considered together) except Louis D. and Anna O. Statham. Their relative percentile interest in the partnership (if coupled with that of their daughter, Anne) was substantially the same as their percentile interest in Corporation. The relative interest of each of them in stock and partnership, when considered separately, had no correlation. The $135,000 purchase price of the Curtiss-Wright patents was not agreed upon immediately but was the result of bargaining. The danger of early obsolescence of the patents, which could considerably reduce their life expectancies, was argued by Subkow and was primarily the reason that Curtiss-Wright was willing to *149 agree to the $135,000 figure. Although subsequent years have established that the purchase of these patents by the partnership at a figure of $135,000 was a bargain purchase because of the unusual longevity they have enjoyed and the profitable industry they have supported, Curtiss-Wright thought that the sale it had made in 1952 was a good bargain - Curtiss-Wright replaced five patents carried on its books at a total $1of (because of uncertainty of value), and acquired $135,000 cash. Lane believed the proceeds would be taxable to Curtiss-Wright, not as ordinary income (as had been true of the royalty payments) but as capital gains, taxable at a preferred rate. But for the willingness of some of the shareholders of Corporation to form the partnership as the purchasing group, the negotiations would probably have fallen through. Prior thereto, negotiations were at an impasse. The minutes of the Board of Directors of Corporation reflect the following regarding a meeting held on March 13, 1952: * * *
The President reported that the company's officers had attempted to negotiate certain changes in the contract under which this corporation pays royalties to the Curtiss-Wright Corporation *150 under the so-called Statham Patents; Curtiss-Wright refused to make any changes in the existing contract but expressed a willingness to sell the patents for $135,000.00, $35,000.00 being payable forthwith and $100,000.00 in annual installments of $25,000.00 each, the sale to be effective as of January 1, 1952, the Curtiss-Wright Corporation reserving to itself, however, certain rights and privileges. A report by Mr. Phillip Subkow as to his activities in attempting to negotiate a new contract with Curtiss-Wright was considered by the Board of Directors. As to whether the corporation should have made an attempt to itself purchase the patents, the president reported that as of the end of January the corporation had in bank cash approximating $26,000.00, while its then current liabilities amounted to over $138,000.00; that by the end of the first week in February, the cash had dropped to approximately $6,000.00, while at the end of the month available cash was about $20,000.00, with substantial demands to be met from it; that the corporation had received a certificate of necessity for the construction of a front office building; that plans were in preparation for that building, and *151 it was estimated that the building would cost in the neighborhood of $80,000.00; that if the corporation were to attempt to buy the patents such would not only seriously impair its present cash position but would materially affect its borrowing capacity, for the reason that although increasing its assets in so far as its books were concerned by $135,000.00, it would also increase the corporation's short term liabilities by $100,000 and that he had been advised that in so far as lending circles were concerned, the creation of such a fixed liability would not be offset by the purchase of the patents; that if the company is to proceed with its new building it will in all probability be forced to borrow additional sums of money and its ability to do so might be adversely affected by the changes in the balance sheet which would be necessitated by such a purchase. He further reported and disclosed that if the corporation did not purchase the patents, the Transducer Patents Company, a limited partnership in which certain officers and directors of the corporation and others were interested, would make the purchase. After further discussion, on motion duly made, seconded and unanimously carried, *152 the following resolution was adopted: RESOLVED that this corporation make no attempt at this time to purchase the so-called Statham Patents from the Curtiss-Wright Corporation. Prior to the adoption of the foregoing resolution, each of the directors stated that he was interested in the resolution, and requested that the fact that such interest had been fully disclosed be set forth in and be made a part of the minutes of the meeting. The President further reported that the Curtiss-Wright Corporation is willing to sell the patents to the Transducer Patents Company, provided that this corporation becomes a party to an agreement wherein and whereby it would be agreed, among other things, that all contracts and agreements heretofore existing between this corporation and Curtiss-Wright be cancelled and terminated as of January 1, 1952; that Curtiss-Wright and this corporation mutually release each other from any and all claims or demands arising out of any existing contracts or agreements; that this corporation agree that in the event the purchaser does not pay any installment of the purchase price when due that it will within fifteen days after written notice of such default from *153 Curtiss-Wright pay the defaulted payment without interest, and that in the event of a default by both the purchaser and this corporation, Curtiss-Wright should have the right to a reassignment of said patents and to retain all monies previously paid as liquidated damages. The agreement would further provide that the corporation and the purchaser would grant to Curtiss-Wright a royalty free, nonexclusive right and license, under each claim of any patent owned by either of them prior to the expiration of the last to expire of the so-called Statham Patents (and prior to any re-assignment of those patents in case of a default under said agreement) which claim is such that all devices covered by such claim are also covered by at least one claim of any one of the so-called Statham Patents. In consideration for the execution of such an agreement, this company would receive a license from the Transducer Patents Company under said patents, together with an option to purchase the same after the expiration of the CarlsonPatents No. 2,036,458 issued April 7. 1936 and No. 2,059,549 issued November 3, 1936, of which this company is now licensee. The following benefits to the corporation appeared *154 to accrue from the execution of such an agreement: (1) The company's method of accounting to Curtiss-Wright in the past has never been audited by that company, and while the officers believe that all royalties payable to Curtiss-Wright have in fact been paid, the elimination of any question by the execution of mutual releases would be of material advantage to the corporation; (2) The company's contingent liability for the payment of any portion of the purchase price of the patents would not have to be set up as a liability on the balance sheet in view of Curtiss-Wright's right to a reassignment of the patents and its right to retain previous payments as liquidated damages; (3) That in the event of a default by the purchaser the company could protect its interests by proceeding with the installment payments. (4) The company had the option to acquire the patents after the present pressing financial demands had been met. After further discussion, the directors present ordered the Secretary to enter in the minutes that each of the directors was interested either as a general or limited partner in the Transducer Patents Company, and that the nature of their several interests had *155 been fully disclosed to the Board. Thereafter, upon motion duly made, seconded and unanimously carried, the following resolution was then adopted: RESOLVED that the president or vicepresident and the secretary or assistant secretary be, and they hereby are authorized and empowered for and on behalf of Statham Laboratories, Inc., a corporation, to enter into and execute a contract or contracts with Curtiss-Wright Corporation and Transducer Patents Company, to be effective as of the first day of January. 1952, and to provide in substance as follows: 1. That all agreements between this corporation and Curtiss-Wright Corporation be terminated and cancelled and said companies mutually release each other from all claims and liabilities arising thereunder. 2. That this corporation be granted a license by Transducer Patents Company under all of the so-called listed Statham Patents, to be computed on the gross sales value of all instruments manufactured and sold embodying any device covered by any of the claims of said patents or as may otherwise be agreed to. 3. That this corporation be granted an option to purchase said patents from the Transducer Patents Company after the expiration *156 of the Carlson Patents for a purchase price equal to the average monthly royalties paid over the two years immediately preceding the exercise of the option, times the number of months then remaining of the life of Patent No. 2,573,286, such purchase price to be paid in such installments as may be negotiated and agreed upon by the officers of the corporation. 4. That this corporation agree with Curtiss-Wright that in the event the Transducer Patents Company defaults in the payment of any installment of the purchase price of said patents that this corporation within fifteen days after demand so to do will pay such amount as may be necessary to cure such default. * * *
On or about March 14, 1952, Curtiss-Wright executed an assignment of the Curtiss-Wright patents to the partnership. The recitals in the assignment described the Curtiss-Wright patents and the constitutency of the partnership (naming its members). It named the partnership as assignee and provided for the conveyance of the entire ownership interest therein from Curtiss-Wright to the partnership. The assignment was delivered to the partnership which caused it to be recorded in the United States Patent Office in Liber *157 K231, p. 375, on April 7, 1952. Also on March 14, 1952, the three-party sale agreement was executed between Curtiss-Wright, the partnership, and Corporation. The agreement provided as follows: AGREEMENT This AGREEMENT entered into as of the 1st day of January 1952 by and between CURTISS-WRIGHT CORPORATION, a Delaware corporation having a place of business at Wood-Ridge, New Jersey (hereinafter called "CURTISS") and TRANSDUCER PATENTS COMPANY, a limited partnership having its principal place of business at 919 No. Rexford Drive, Beverly Hills, California, said limited partnership being composed of Louis D. Statham, of said address, general partner; and the following limited partners, Anna O. Statham, Anne E. Statham and Sarah E. Gass of Beverly Hills, California, Caleb E. Motz and Ransom Chase, of Los Angeles, California, and Gifford E. White of Tarzana, California (hereinafter called "ASSIGNEE"), and STATHAM LABORATORIES, INC., a California corporation having a place of business at Los Angeles, California (hereinafter called "LABORATORIES"). WITNESSETH: WHEREAS, CURTISS is the owner of the following patents, hereinafter referred to as the "Listed Statham Patents", to wit: *158 * * *
WHEREAS, CURTISS and STATHAM LABORATORIES, a co-partnership composed of Louis D. Statham and Anna O. Statham, and Louis D. Statham, individually, did enter into an agreement on September 7, 1943 entitled "Underlying Agreement Relating to Purchase Orders", which agreement, together with all amendments thereto, is hereinafter referred to as the "Underlying Agreement" and did also enter into an agreement of license having an effective date of January 1, 1945 and relating to inventions covered by said Listed Statham Patents, which agreement is herein referred to as the "License Agreement" and which License Agreement has been assigned to LABORATORIES with the consent of CURTISS. NOW, THEREFORE, the parties agree as follows: 1. CURTISS warrants unto ASSIGNEE and LABORATORIES that it is the owner of the Listed Statham Patents and that CURTISS has not granted any License or any other right under said Listed Statham Patents, or any of them, except as is provided in the said License Agreement. 2. CURTISS does hereby sell, assign, transfer and set over unto ASSIGNEE the entire and exclusive right, title and interest in and to the inventions of each of said Listed Statham Patents *159 and the entire and exclusive right, title and interest in and to each of the said Listed Statham Patents and all reissues and extensions thereof, and agrees to execute, concurrently with the execution by it of this agreement, an assignment in the form of Exhibit "A" attached hereto and incorporated in this agreement by this reference. 3. ASSIGNEE agrees to pay to CURTISS a total of One Hundred and Thirty-five Thousand Dollars ($135,000.00), payable without interest, as follows: Upon execution hereof
$35,000.00
On or before March 1, 1953
25,000.00
On or before March 1, 1954
25,000.00
On or before March 1, 1955
25,000.00
On or before March 1, 1956
25,000.00
4. LABORATORIES agrees that, in the event that ASSIGNEE does not pay any of said installments, at the times provided therefor, it will, within fifteen days next after written notice of such default is communicated by CURTISS to LABORATORIES, pay to CURTISS the said defaulted payment, without interest. 5. ASSIGNEE agrees that it will not assign or transfer the Listed Statham Patents or any of them to other than LABORATORIES, without the written consent of CURTISS first obtained, unless and until all sums *160 of money payable under Article 3 hereof, shall have been paid in full. 6. In the event of default by both ASSIGNEE and LABORATORIES, CURTISS, in addition to all other rights which it may have under this agreement, and all other remedies at law or in equity, shall also have the right to demand reassignment to CURTISS of the Listed Statham Patents, and ASSIGNEE agrees, on such demand, promptly to execute in writing an assignment thereof to CURTISS, and CURTISS shall be entitled to retain to itself, as liquidated damages, all money previously received, whether paid by LABORATORIES or by ASSIGNEE hereunder. 7. The ASSIGNEE will, in each agreement of license granted by it under said Listed Statham Patents, provide that such license shall terminate upon the reassignment of said patents to CURTISS pursuant to the provisions of Article 6 hereof. 8. CURTISS and LABORATORIES do hereby declare the Underlying Agreement and the License Agreement cancelled and terminated and do hereby release each other from all claims, demands, causes of action, known or unknown, to the parties hereto, which have hitherto arisen or may now or may hereafter arise under said Underlying Agreement and License *161 Agreement, or either of them, and declare all of said claims, demands and causes of action, fully satisfied by this agreement. 9. ASSIGNEE hereby grants to CURTISS an irrevocable non-exclusive royalty-free right and license under the Listed Statham Patents to make or to have made for CURTISS in the United States, for use, sale and/or re-sale, throughout the world, the inventions covered by the Listed Statham Patents or any of them, without any accounting whatsoever to anyone. 10. ASSIGNEE and LABORATORIES jointly and severally agree to grant to CURTISS a royalty-free non-exclusive right and license under each claim of any patent owned by them, or either of them, at any time subsequent to the date hereof and prior to the expiration of the last-to-expire of the Listed Statham Patents and also prior to any re-assignment of the Listed Statham Patents, pursuant to the provisions of Article 6 hereof, which claim is such that all devices covered by such claim are also covered by at least one claim of any one of the Listed Statham Patents. 11. LABORATORIES also agrees, on demand in writing by CURTISS, to grant or to procure the grant to CURTISS of a non-exclusive license under Carlson *162 Patent No. 2,036,458 issued April 7, 1936 and CarlsonPatent No. 2,059,549 issued November 3, 1936, at the royalty rates required of LABORATORIES on account of sales by its sublicensees and upon the terms and conditions set forth in the agreement between LABORATORIES and Carlson dated April 10, 1948, a copy of which said agreement is hereto attached and marked Exhibit B. 12. CURTISS agree to grant to ASSIGNEE the right to grant to LABORATORIES without payment of royalty to CURTISS or in any way accounting to CURTISS, a non-exclusive right and license under each claim of any patent owned by CURTISS, at any time subsequent to the date hereof and prior to the expiration of the last-to-expire of the Listed Statham Patents and also prior to any reassignment of the Listed Statham Patents, pursuant to the provisions of Article 6 hereof, which claim is such that all devices covered by such claim are also covered by at least one claim of any one of the Listed Statham Patents. 13. No license is, or may be, granted or agreed to be granted hereunder, by implication or otherwise, either to CURTISS or to LABORATORIES, under any patents or claims of any patents, except as is specifically provided *163 in Articles 9, 10, 11 and 12. IN WITNESS WHEREOF the parties hereto have caused this instrument to be executed in their respective behalves as of the day and year first above written. * * *
The three-party agreement contained mutual cancellation of the Curtiss-Wright license and a mutual release as between Curtiss-Wright and Corporation. Curtiss-Wright had no matured claims against Corporation. Curtiss-Wright knew of no claims which Corporation had against it. Corporation regarded the release as valuable to it since it freed Corporation from possible liabilities accruing before January 1, 1952, to Curtiss-Wright based upon the uncertain coverage of the Curtiss-Wright license. Statham believed that depending on how the royalties were to be calculated and the Curtiss-Wright contract interpreted, Corporation's liability to Curtiss-Wright for pre-1952 sales could have been $40,000 to $45,000. Whatever the possible liability to Curtiss-Wright, the release was intended by Corporation to cancel it and to resolve the doubt. On March 14, 1952, the partnership opened a checking bank account at Security First National Bank (hereinafter referred to as Security Bank), Beverly Hills *164 Branch. The first two checks drawn on the account were made in favor of Curtiss-Wright. The first check (No. 1) was in the sum of $35,000, and the second (No. 2) was in the sum of $1. The $35,000 check was tendered to Curtiss-Wright as the payment due under the provisions of paragraph 3 of the agreement. The check for $1 was tendered to Curtiss-Wright under the provisions of Exhibit A of said agreement. The checks were mailed to Curtiss-Wright on March 14, 1952, with a letter of transmittal from Subkow. Curtiss-Wright accepted the checks as the payments so tendered. The receipt of Subkow's letter of March 14, 1952, was acknowledged by the addressee by a letter dated March 21, 1952, and received on March 25, 1952, by Subkow together with the enclosures referred to in the letter. The partnership made payments to Curtiss-Wright as follows: March 14, 1952
$ 35,000
March 14, 1952
1
February 20, 1953
25,000
February 22, 1954
25,000
February 21, 1955
25,000
February 20, 1956
25,000
Total
$135,001
All such payments were made by certified check drawn on the partnership's bank account and transmitted by the partnership to Curtiss-Wright in payment of the amounts *165 owing to Curtiss-Wright under paragraph 3 of the agreement. Corporation was not, and was never intended by any of the negotiators or their principals to be, the purchaser of the patents. Neither on the final agreements as drafted, nor on any of the drafts, nor on any of the scratch notes of the negotiators, was the name of Corporation ever suggested or written as the proposed purchaser. Curtiss-Wright intended, as a result of the sales agreement and assignment, that ownership of the patents would be vested in the partnership and not in Corporation, and that as of January 1, 1952, all rights to sue for infringement after that time were vested in the partnership. From and after January 1, 1952, royalties paid by Corporation for sales of items covered by the Curtiss-Wright patents from and after that date were made to the partnership. As a part of the documentation in mid-March 1952, an agreement was made between Curtiss-Wright and the Stathams cancelling the old Curtiss-Wright license and mutually releasing the parties. This appeared to be desirable because neither Laboratories nor Statham as an individual had ever actually assigned to Corporation their interests in the Curtiss-Wright *166 license. In 1952 Corporation expected that the useful life of the Curtiss-Wright patents would be about three to four years. This belief was based on the fact that the patents were in a scientific field which was changing rapidly. Thousands of scientists all over the country were working on the problem of converting mechanical energy to electrical signals for scientific testing. Any day the Curtiss-Wright patents could become obsolete. At the time the partnership bought the patents, Corporation was manufacturing three principal products. One of these became completely obsolete within two years. The second became obsolescent in three years. The third product (pressure transducers) survived. Sudden and unexpected obsolescence of patents is very common. They can die overnight. Because of the risk involved, the individual officers and shareholders of Corporation, including Statham, were reluctant and unwilling to form a partnership and put up their own personal funds to make the downpayment for the patents. Only after much discussion and debate among themselves did they agree to do so. Three of the reasons why management of Corporation concluded that Corporation could not buy the *167 patents from Curtiss-Wright were: 1. Such a purchase obligation would have been ruinous to Corporation's credit. 2. Such a purchase obligation might not be a prudent investment in light of the danger of early obsolescence of the patents. 3. Despite the Korean war buildup and the upward trend of Corporation's business, its future was not guaranteed or assured, in that its backlog consisted predominantly of military defense contracts which were subject to immediate cancellation. Yet despite these hazards, Statham felt impelled to find some means of concluding an agreement with Curtiss-Wright in order to obtain the patent protection which, upon the expiration of the Carlson patents, would become vital to the life of the business. In order to meet the increased demand for its product, Corporation had to expand its facilities and build new plants and, to finance such expansion, obtain additional working capital and credit. To meet these working capital needs, Corporation had for some years obtained working capital from banks which supplied Corporation with additional working capital by and through the establishing of an open line of credit for Corporation. In early 1947 Corporation *168 established a $10,000 line of credit with Citizens National Bank. This line of credit, as Corporation continued to grow and expand, became insufficient; and late in 1947 when the Citizens National Bank refused to enlarge the line of credit to $15,000 Corporation took its account to the Security Bank. Security Bank granted Corporation a line of credit in the amount of $25,000, which thereafter was periodically raised as Corporation's needs for working capital became more insistent. Commencing in 1951, the line of credit with Security Bank was at a level of $60,000; and it remained at this level throughout most of 1952. In October 1952 the line of credit was raised by Security Bank to $100,000. In November 1952 Corporation requested the bank to loan an additional $50,000, and Security Bank declined to grant this increase. Corporation then withdrew its account from Security Bank and went to the Union Bank, which granted Corporation a short-term line of credit of $100,000 repayable in 90 days, plus an additional $50,000 repayable in 10 days. Mindful of the insistence of Security Bank on a "good looking balance sheet," Corporation kept its assets completeely free and clear of any encumbrances. *169 Security Bank, when it grants open lines of credit, customarily imposes certain financial restrictions on Corporation. In analyzing Corporation's financial statements, Security Bank paid particular attention to the ratio of debt to worth and excluded from the computation of net worth intangible assets such as patents, goodwill, and trademarks, which might be of value to Corporation but were not of any ascertainable value to a lending institution. Security Bank was also concerned that Corporation's business was based upon certain patents which were subject to possible obsolescence overnight. Security Bank was concerned generally that Corporation should maintain an adequate working capital base. Responsive to these times, and in order to safeguard this line of credit established in favor of Corporation, Security Bank imposed on Corporation a number of conditions, restrictions, and prohibitions for the maintenance and continuation of its line of credit. These were that Corporation was not to: (a) Drop below a minimum level of $50,000 of working capital; (b) Encumber any of its assets; (c) Borrow (there were to be no assignments of accounts receivable, chattel mortgages, or mortgages *170 or trust deeds given on Corporation's assets); (d) Pay any dividends at all; (e) Grant any increases whatsoever in officers' salaries; (f) Drop below a certain minimum net worth; and (g) Incur any sizeable long-term obligations or liabilities. Security Bank warned Corporation that compliance with these conditions was necessary to the continued maintenance of the line of credit and that if Corporation violated any of the conditions, the results might be immediate cancellation or material reduction of the line of credit. Corporation assured Security Bank that it would comply fully with these conditions. The conditions were in effect during the months of January, February, and March 1952. Corporation's management believed that if Corporation bought the patents from Curtiss-Wright it would violate one or more of the bank's conditions and would thereby bring about the loss or material reduction of its line of credit. Management believed that by taking on such a purchase obligation Corporation would be violating the minimum working capital requirement by depleting cash on hand and by using up some of the line of credit. Statham himself knew that the bank would not regard these *171 five patents as a "hard asset" of any material value when assessing Corporation's balance sheet for loan purposes. Corporation was informed by representatives of Security Bank that the patents would be disregarded even though they might be shown on the company's balance sheet as an asset having a book value of $135,000, and in deciding whether to extend or continue the line of credit the bank would be required to pay heed to the $100,000 long-term liability which Corporation would be undertaking. It was for these reasons that White told Subkow, then engaged in negotiations with Curtiss-Wright in New Jersey, that Corporation could not buy the patents. The formation of the partnership by shareholders of Corporation, and the acquisition of the patents by the partnership rather than by Corporation, accomplished for Corporation the following beneficial effects: (a) It provided the vitally necessary patent shelter, in that henceforward the patents were in "friendly" hands, i.e., the shareholders of Corporation - which was satisfactory not only to Corporation but also to Security Bank. (b) The mutual release executed by and between Corporation and Curtiss-Wright put an end to the potential *172 liability of Corporation to Curtiss-Wright. (c) Corporation's line of credit was not reduced and the purchase obligation did not show on Corporation's financial statements, since it was not an obligation of Corporation. These were exactly the benefits which Corporation expected to gain, as reflected in the minutes of the Board of Directors quoted supra. The partnership made the purchase as an investment. Except for the Curtiss-Wright transaction none of the partners has ever bought or sold patents for his own use. Although the documents consummating the agreement with Curtiss-Wright and the assignment to the partnership were executed on March 14, 1952, there was no written agreement executed between the partnership and Corporation until the fall. Until this time, and during these intervening months, Corporation made and manufactured transducer inventions under an oral license from the partnership, for which Corporation paid the partnership a royalty of 5 percent. Subkow had been authorized in March to proceed with the drafting of a written license agreement between the partnership and Corporation. He finished the draft of this rather elaborate agreement in late May of 1952. *173 At the time of the acquisition from Curtiss-Wright, it was orally understood that the partnership was to receive a 5 percent royalty on sales of the patented items. There was no discussion then of a minimum royalty. The contract was actually signed sometime between the end of May 1952 and November 4, 1952. Like the three-party agreement, the partnership license agreement was entered into as of January 1, 1952, even though it was not actually signed until well past the middle of the year. It called for the payment of royalties on sales of items covered by the Curtiss-Wright patents. The royalty rate was fixed at 5 percent for a nonexclusive license from the partnership and at 8 percent for an exclusive license if Corporation chose to exercise its options granted in the agreement to obtain an exclusive license. The options were exercised as to certain inventions on April 8, 1953, and on November 4, 1953, as to the rest. The exercise of the options to acquire the exclusive rights to make, use and sell was documented by agreements between the parties, one dated May 27, 1953, and one dated November 4, 1953. Before the time of the creation of the partnership, Corporation had been paying *174 a royalty of 3 percent to Carlson and 5 percent to Curtiss-Wright, a total of 8 percent. It was intended that the 8 percent rate not be changed when the partnership became the patent owner instead of Curtiss-Wright. The partnership license agreement also made provision giving Corporation the right to acquire the patents for a fixed price. The price was to be based on a formula. The formula was, in essence, a lump-sum figure calculated by taking the running royalties payable to the partnership over any previous two-year period. Corporation did not choose to invoke the option to buy for the fixed purchase price. This option to buy for a fixed purchase price was, according to the agreement, to expire on March 15, 1956. The management of Corporation paid the partnership $10,000 on that date for the right to have the option extended for one year because it was still being considered as a possibility. That option was permitted to expire on March 15, 1957. This was because Corporation decided that it was in its best business interests to continue the percentage royalty arrangement. The license arrangement between Corporation and the partnership was fair, reasonable, and equitable. The *175 terms were consistent with customary practices and usages in the licensing of similar patents. The contract obligations assumed by Corporation were not excessive or unreasonable in exchange for what Corporation received from the partnership. Royalty rates in this field usually run from 5 percent to 10 percent. The royalty rate for an exclusive license generally runs higher than the rate for a nonexclusive license. At the time the license agreement between Corporation and the partnership was entered into, the Statham strain gauge transducer devices had already been on the market for several years. They had achieved good customer acceptance and were highly regarded in the trade. Future market prospects looked good and were on the increase. Corporation has made use of the transducer patents on the hundreds of different products which it has produced. Virtually all of the income of Corporation was dependent, either directly or indirectly, upon the use of the patents. In every year but one, the combined income from sales of patented devices and sales related thereto constituted over 97 percent of the total income of Corporation. Corporation made good profits after payment of royalties. *176 Net profits of Corporation before income taxes ranged from approximately $35,500 in 1947 up to $352,000 in 1956. For the years 1947 through 1956, the return which Corporation received on its capital investment before income taxes ranged from 28.2 percent to 109.2 percent. The average return was 47 percent. Return on capital investment after income taxes ranged from 15 percent to 67.5 percent. The average return was 27 percent. In no year was the return on capital investment, either before or after income taxes, ever below 15 percent. A substantial and continuous increase in the net worth of Corporation took place from 1950 through 1956. The net worth went from $264,375.55 in 1950 to $740,195.51 in 1956. In view of all the facts present at the time the partnership license agreement was entered into, the royalty rates which Corporation agreed to pay were fair, reasonable, and equitable. They were, in fact, lower than the rates which might reasonably be expected if the licensing agreement had been negotiated by parties dealing at arm's length. The licensing agreement between Corporation and the partnership was fair and equitable, and the obligations assumed thereunder by Corporation *177 were not excessive or unreasonable. In 1955 Corporation had a large informal order from a United States Government instrumentality known as Arnold Engineering Company. The total amount of the order was $200,000. After Corporation had delivered $150,000 worth of instruments and had another $45,000 worth ready for shipment, Arnold Engineering Company advised Corporation that unless the royalty rate paid by Corporation to the partnership was reduced from 8 percent to 5 percent Arnold Engineering Company would cancel its entire order and would encourage competitors to manufacture the same products upon an indemnity from Arnold against liabilities for infringement of the Curtiss-Wright patents. Under these circumstances, the partnership felt that it had no choice but to reduce the royalty rates which were being paid to it by Corporation. The partnership realized that if a secondary source of supply were developed by the Government this might diminish the royalty payments which it would otherwise receive. An amendment to the exclusive license arrangement was made and dated as of January 1, 1956. This amendment was executed on or before that date by the partnership and Corporation. It *178 provided for a reduction in the rate of royalty from 8 percent to 5 percent but continued the exclusive use arrangement which had theretofore been practiced. This change to accommodate the Government had no bearing on the reasonableness of the 8 percent royalty. In its dealing after March 14, 1952, Corporation conducted itself as the licensee and not the owner of the patents. When Corporation made its public offering of stock, it filed a Registration Statement with the Securities Exchange Commission. In that statement and in various other publications, Corporation described its position as the licensee of the partnership and not as the owner of the patents. Royalties paid or accrued by Corporation to the partnership for the years involved in the present controversy were as follows: Fiscal Year Ended
Amount
May 31, 1954
$149,186.20
May 31, 1955
185,037.03
May 31, 1956
180,874.43
All distributions to the partners were made in proportion to their respective partnership interest and not in proportion to their stockholdings, if any. Respondent, in his deficiency notice to Corporation, has disallowed as a deduction the "royalty" payments made to the partnership *179 during the years in issue. In the deficiency notice to the individuals, respondent has treated the payments made to the partnership by Corporation as disguised dividends, and taxed the individuals accordingly. Ultimate Findings of Fact The Curtiss-Wright patents were acquired as an investment by the partnership and not by Corporation. The purchase price to Curtiss-Wright of $135,000 was paid by the partnership, not Corporation. The partnership was at all times, as intended, the owner of the patents. Corporation, for valid business reasons, declined to make the purchase itself. The partnership had a reasonable license agreement with Corporation for the payment of royalties. The agreement and the royalties paid to the partnership meet the standard of what third parties, as strangers, would have done in dealing with one another at arm's length. The royalties paid were not excessive but rather were ordinary and necessary expenses of Corporation in doing its business. The payments of the royalties were not dividends in disguise. All substantial rights in the Curtiss-Wright patents were conveyed by the partnership to Corporation by the medium of the exclusive license agreement. *180 Opinion Petitioners argue that the patents sold by Curtiss-Wright were in form as well as in substance purchased by the partnership and as such Corporation is entitled to deduct as an ordinary and necessary business expense the payment of royalties to the partnership. Petitioners contend that the payments in issue were reasonable so that Corporation is entitled to a deduction in the full amount of the payments. Petitioners further contend that the receipt by the individual partners of their respective partnership shares should be taxed to them as long-term capital gains. [2]
Respondent, on the other hand, maintains that in substance Corporation became the owner of the Curtiss-Wright patents and that therefore the so-called "royalty" payments are not deductible by Corporation and are taxable to the individuals as disguised dividends. [3] In the event that this Court finds that the partnership did in fact purchase the patents, *181 respondent argues that Corporation is entitled to a deduction for only that portion of the royalty payments which is reasonable in amount. It is respondent's position that the rate paid to the partnership is unreasonable. We agree with petitioners. Respondent is not attempting to reallocate income under section 45, Internal Revenue Code of 1939, or section 482, Internal Revenue Code of 1954. Cf. Sanford H. Hartman, 43 T.C. 105, 116 (1964). Nor is respondent taking the position that the series of transactions and agreement which took place herein are unreal and should be disregarded as being a sham. *182 His only contention is that the substance of the series of events should be looked at rather than the form. Once this is done, respondent contends that the only logical conclusion is that Corporation became the owner of the patents. With this we cannot agree. Respondent's entire case is based upon the premise of what he terms a "tax avoidance scheme." It is argued by respondent that if Corporation did buy the patents here involved from Curtiss-Wright, there would be no deduction for "royalty" payments and any payments to the stockholders would be taxable as ordinary dividends. However, the creation of a partnership composed of the principal stockholders of Corporation, which then acquires the patents, gives the double benefit of a deduction to Corporation and capital gains to the partners. It is for this reason that respondent concludes that the substance of the series of transactions culminated in the purchasing of the patents by Corporation. Accordingly, respondent denies recognition to the series of transactions solely because of the tax benefit derived from the form in which they were cast. Respondent is, in effect, making motive the sole criteria for determining the legitimacy *183 of a transaction. Needless to say, this is an erroneous position. The legal right of a taxpayer to arrange his affairs so as to decrease the amount of what would otherwise be his taxes or altogether avoid them cannot now be questioned. United States v. Isham, 84 U.S. 496, 506 (1873); Gregory v. Helvering, 293 U.S. 465 (1935); Bridges v. Commissioner, 325 F. 2d 180 (C.A. 4, 1963), affirming 39 T.C. 1064 (1963); Henry C. Beck Builders, Inc., 41 T.C. 616, 627 (1964). In so arranging his affairs, a taxpayer may choose any form of doing business he desires without being required to adopt the form which results in the greatest tax. Sanford H. Hartman, supra, at 117; Atchison, Topeka & Santa Fe Railway Co., 36 T.C. 584, 597-598 (1961); Palm Beach Aero Corporation, 17 T.C. 1169, 1176 (1952). The tax consequences do not depend upon the motive or purpose in entering into a transaction, Fabreeka Products Company v. Commissioner, 294 F. 2d 876, 878 (C.A. 1, 1961), [4] vacating and remanding 34 T.C. 290 (1960); Sun Properties v. United States, 220 F. 2d 171, 174 *184 (C.A. 5, 1955), but upon whether the transaction was in fact what it appears to be in form. Chisholm v. Commissioner, 79 F. 2d 14, 15 (C.A. 2, 1935), [5] reversing 29 B.T.A. 1334 (1934), certiorari denied 296 U.S. 641 (1935). That is to say, a taxpayer's motive to avoid taxation will not establish liability unless the transaction does so regardless of the motive. United States v. Cumberland Pub. Serv. Co., 338 U.S. 451 (1950); Arthur J. Kobacker, 37 T.C. 882, 894 (1962). Therefore, our sole inquiry is not what the purpose or motive of the taxpayer was, but "whether what is claimed to be is in fact." Kraft Foods Company v. Commissioner, 232 F. 2d 118, 128 (C.A. 2, 1956), reversing on other grounds 21 T.C. 513 (1954); Loewi v. Ryan, 229 F. 2d 627, 629 (C.A. 2, 1956). We recognize, as we must, that in this case we are dealing with "related" parties and that tax considerations played a part in the form that the transactions took. However, agreements between stockholders (and partnerships composed of stockholders) and their corporations are valid and enforceable if, after being judged *185 by standards applicable to parties dealing at arm's length, they are found to be fair and reasonable. Stearns Magnetic Mfg. Co. v. Commissioner, 208 F. 2d 849, 852 (C.A. 7, 1954), [6] reversing and remanding a Memorandum Opinion of this Court. Roy J. Champayne, 26 T.C. 634, 645 (1956). We are not ready to state, as respondent maintains, that the presence of a tax avoidance motive by itself requires a finding that a transaction is something other than what it purports to be. Sun Properties v. United States, supra.We realize that the presence of a tax motive, together with dealings between related parties, requires close scrutiny of the transactions to determine whether the substance is, in reality, identical with the form; nevertheless, we feel the presence of these factors is not the end of our inquiry but just the beginning. Nassau Lens Co. v. Commissioner, 308 F. 2d 39, 45 (C.A. 2, 1962), [7] remanding 35 T.C. 268 (1960); Goldstein v. Commissioner, 298 F. 2d 562 (C.A. 9, 1962), affirming a Memorandum Opinion of this Court. *186 We have carefully examined the entire record in this case, and in light of the above principles are convinced that the substance of the transactions corresponds in all material facts to the form. A review of the salient facts will clearly indicate the legitimacy of the transactions here involved. Prior to 1952, Corporation, operating under a license agreement which was initially entered into between Laboratories, the predecessor of Corporation, and Curtiss-Wright, was paying royalties at the rate of 5 percent to Curtiss-Wright for the nonexclusive right to manufacture articles covered by certain patents owned by Curtiss-Wright. At the same time, Corporation was paying royalties at the rate of 3 percent to Carlson for the exclusive right to manufacture products covered by patents owned by him. These royalty payments, totaling 8 percent, were being deducted by Corporation as an ordinary and necessary business expense and are not here in issue. Curtiss-Wright and Carlson were not in any way related to Corporation. With the expiration dates of the Carlson patents rapidly approaching, Corporation decided to contact Curtiss-Wright with the intention of obtaining an exclusive license *187 in lieu of the present nonexclusive license. Corporation did not enter into negotiations with Curtiss-Wright with the aim of buying the patents. The attempt to obtain an exclusive license failed, whereupon Curtiss-Wright, not Corporation, proposed that Corporation purchase the patents. This idea of purchasing the patents was turned down by Corporation for business reasons, which, although we feel are not material for our decision, are fully supported in the record. The negotiator for Corporation was instructed to see if Curtiss-Wright would be willing to sell the patents on a time basis to a partnership, not yet formed, but which would consist of the major stockholders of Corporation. Curtiss-Wright agreed. From this point on it was clear that the purchaser was to be a partnership. Although the same representative of Corporation carried on the negotiations, Curtiss-Wright clearly understood that he was now representing the partnership. Glasgow Village Development Corporation, 36 T.C. 691, 701 (1961). From this point on, we have set forth the facts, together with the pertinent agreements, in our Findings of Fact. Nothing would be accomplished by our repeating them again. *188 Sufficient to say that the record clearly supports a finding that the partnership was the purchaser of the patents and that at no time did Corporation ever intend or contemplate being the owner of the patents. Curtiss-Wright, an unrelated party, accepted and treated the partnership as the owner; Corporation never made any representations that it was the owner of the patents. True, Corporation's business success depended upon its right to manufacture the articles covered by the Curtiss-Wright patents. While this fact might indicate that Corporation could have purchased the patents and that it may have been reasonable for it to do so, it does not show that Corporation did in fact purchase the patents. Cf. Cedar Valley Distillery Co., 16 T.C. 870, 876-877 (1951). The partnership was a separate business entity from that of Corporation, and it purchased the patents. The partnership assumed a name very different from that of Corporation; the name was filed with the local State authorities; the partnership filed its own income tax returns., and the money used to purchase the patents came from the private resources of the individual partners and not from Corporation. All these *189 factors clearly indicate that in substance as well as in form the partnership was the real purchaser of the Curtiss-Wright patents. Palm Beach Aero Corporation, supra, at 1176. Having found that the partnership and not Corporation was the purchaser of the patents, our next inquiry is whether Corporation can deduct as ordinary and necessary business expenses the royalty payments made to the partnership. To the extent that the royalty payments are reasonable, Corporation is entitled to a deduction. Heatbath Corporation, 14 T.C. 332 (1950); Albert T. Felix, 21 T.C. 794, 803-804 (1954). When we are dealing with related parties, we are mindful of the necessity to scrutinize carefully the transactions to prevent a corporate deduction for what is in reality a distribution of a dividend. Ingle Coal Corporation v. Commissioner, 174 F. 2d 569 (C.A. 7, 1949), affirming 10 T.C. 1199 (1948). However, in this case the royalty payments by Corporation to the partnership were clearly reasonable in amount. Corporation was paying a 5 percent royalty to Curtiss-Wright prior to the purchase of the patents by the partnership. Subsequent *190 to the purchase, the partnership licensed Corporation to continue to produce the products covered by the patents for a 5 percent royalty. Under the Carlson patents, Corporation paid a 3 percent royalty for the exclusive right to produce the products covered by the patents. When the Carlson patents expired, Corporation acquired an exclusive right to produce the products under the Curtiss-Wright patents now owned by the partnership. For this extra right, Corporation was required to pay a royalty of 8 percent instead of the previous 5 percent. However, the 8 percent royalty was exactly the same total royalty Corporation was paying to Curtiss-Wright and Carlson. The petitioners introduced expert testimony to the effect that royalty payments in this field of 5 percent to 10 percent are common and standard practice. The testimony also, in our opinion, clearly establishes the proposition that an exclusive license demands a higher rate of royalty because of the added protection it affords. Based upon this testimony and upon the royalty rates paid to unrelated parties in the form of Curtiss-Wright and Carlson, we hold that the royalties paid to the partnership were reasonable in amount and *191 were fully deductible by Corporation. Roy J. Champayne, supra, at 646; Differential Steel Car Co., 16 T.C. 413, 424-425 (1951); John T. Potter, 27 T.C. 200, 214 (1956); Neugass v. United States, an unreported case ( D. Okla. 1959, 3 A.F.T.R. 2d 773). Respondent has argued throughout this case that since there was no business purpose in creating the partnership and that any benefit derived from this arrangement was the reduction of taxes, the form the transactions were cast in should be disregarded. Respondent, in support of his arguments, attempts to destroy petitioners' reasons for not having Corporation purchase the patents. Respondent states that the documentary evidence of record clearly establishes that Corporation was in a financial position to purchase the patents and, furthermore, would save money in the long run if it purchased the patents as it would not have to make any further royalty payments. While we do not think the facts support respondent's position, it is not necessary for us to decide this point. Even if we assume respondent is correct, all this requires is a closer scrutiny of the transactions to see whether *192 the substance was in fact any different than the form of the transactions. Sun Properties v. United States, supra.This we have done, and we are satisfied that the form of the transactions was no different than the substance. We are not concerned with why Corporation did not buy the patents but with the question of who did in fact purchase the patents. Chisholm v. Commissioner, supra.To say that Corporation did purchase the patents because Corporation could have or because it, using hindsight, was cheaper to do so, does not show that Corporation did in fact purchase the patents. We will not recast these transactions because respondent argues an approach which is more advantageous to the revenue. Albert W. Badanes, 39 T.C. 410, 416 (1962). Nor do we feel that the "sale-leaseback" cases [8] cited by respondent require a different conclusion here. In each of those cases the initial transactions were between related parties, while in the instant case the purchase by the partnership was from an unrelated party. This fact alone distinguishes the cases relied upon by respondent. *193 Having found that the patents were purchased by the partnership and that the royalty payments made thereto by Corporation were reasonable in amount and thereby fully deductible as royalty payments, it necessarily follows that the distributions to the partners were not diguised dividends. Accordingly, we hold for petitioners on this issue. To reflect concessions made by the parties, Decisions will be entered for the petitioners in Docket Nos. 1370-63 and 1372-63. Decisions will be entered under Rule 50 in Docket Nos. 1320-63, 1369-63, 1371-63, 1373-63, and 1374-63. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Caleb Armistead Motz and June Jaquith Motz, Docket No. 1369-63; June Jaquith Motz, Docket No. 1370-63; Estate of Charles S. Gass, Deceased, Sarah E. Gass, Executrix, and Sarah E. Gass, Docket No. 1371-63; Caleb Armistead Motz, Docket No. 1372-63; Louis D. Statham and Anna O. Statham, Docket No. 1373-63; Statham Instruments, Inc. (Formerly Statham Laboratories, Inc.), Docket No. 1374-63.↩
1. Corporation acquired the 1800 shares of Gifford White from him on or about June 16, 1952, for $27,000. White thereafter was not a stockholder.↩
2. Respondent does not question the reporting by the individual petitioners of their distributive shares as long-term capital gains if this Court finds that the partnership did purchase the patents and that the royalty payments are reasonable in amount.↩
3. Respondent is not arguing that the transaction here involved is a sham, as evidenced from the following quotation from his reply brief: The petitioners have continuously implied throughout this case that the Commissioner has been charging sham. As previously stated, the Commissioner has made no such charge. Therefore, respondent has made many objections to petitioners' proposed findings on the grounds that the proposed findings mislead the Court into consideration of sham. The Court need not go into the sham aspect of the case at all; * * *↩
4. Subsequently cited with approval by this Court in Frank W. Verito, 43 T.C. 429↩ (1965). 5. Subsequently cited with approval by this Court in H. L. McBride, 23 T.C. 901, 907↩ (1955). 6. Subsequently cited with approval by this Court in Roy J. Champayne, 26 T.C. 634, 645↩ (1956). 7. Subsequently cited with approval by this Court in 2554-58 Creston Corp., 40 T.C. 932, 936↩ (1963).
8. Respondent cites I. L. VanZandt, 40 T.C. 824 (1963), affd. 341 F. 2d 440 (C.A. 5, 1965); Egbert J. Miles, 41 T.C. 165 (1963), on appeal (C.A. 2, Feb. 7, 1964); and Warren Brekke, 40 T.C. 789↩ (1963), on appeal (C.A. 9, March 24, 1964).